Filed 6/23/14   (Reposted 6/26/14 to augment listing of counsel who argued in Supreme Ct.; no change to opn. text)

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| ARSHAVIR ISKANIAN, | ) | |
| | ) | |
| Plaintiff and Appellant, | ) | |
| | ) | S204032 |
| v. | ) | |
| | ) | Ct.App. 2/2 B235158 |
| CLS TRANSPORTATION | ) | |
| LOS ANGELES, LLC, | ) | |
| | ) | Los Angeles County |
| Defendant and Respondent. | ) | Super. Ct. No. BC356521 |
| _____ | ) | |

In this case, we again address whether the Federal Arbitration Act (FAA) preempts a state law rule that restricts enforcement of terms in arbitration agreements. Here, an employee seeks to bring a class action lawsuit on behalf of himself and similarly situated employees for his employer's alleged failure to compensate its employees for, among other things, overtime and meal and rest periods. The employee had entered into an arbitration agreement that waived the right to class proceedings. The question is whether a state's refusal to enforce such a waiver on grounds of public policy or unconscionability is preempted by the FAA. We conclude that it is and that our holding to the contrary in *Gentry v. Superior Court* (2007) 42 Cal.4th 443 (*Gentry*) has been abrogated by recent United States Supreme Court precedent. We further reject the arguments that the class action waiver at issue here is unlawful under the National Labor Relations

Act and that the employer in this case waived its right to arbitrate by withdrawing its motion to compel arbitration after *Gentry*.

The employee also sought to bring a representative action under the Labor Code Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.). This statute authorizes an employee to bring an action for civil penalties on behalf of the state against his or her employer for Labor Code violations committed against the employee and fellow employees, with most of the proceeds of that litigation going to the state. As explained below, we conclude that an arbitration agreement requiring an employee as a condition of employment to give up the right to bring representative PAGA actions in any forum is contrary to public policy. In addition, we conclude that the FAA's goal of promoting arbitration as a means of private dispute resolution does not preclude our Legislature from deputizing employees to prosecute Labor Code violations on the state's behalf. Therefore, the FAA does not preempt a state law that prohibits waiver of PAGA representative actions in an employment contract.

Finally, we hold that the PAGA does not violate the principle of separation of powers under the California Constitution.

## I.

Plaintiff Arshavir Iskanian worked as a driver for defendant CLS Transportation Los Angeles, LLC (CLS) from March 2004 to August 2005. In December 2004, Iskanian signed a "Proprietary Information and Arbitration Policy/Agreement" providing that "any and all claims" arising out of his employment were to be submitted to binding arbitration before a neutral arbitrator. The arbitration agreement provided for reasonable discovery, a written award, and judicial review of the award; costs unique to arbitration, such as the arbitrator's fee, would be paid by CLS. The arbitration agreement also contained a class and representative action waiver that said: "[E]xcept as otherwise required under

2

applicable law, (1) EMPLOYEE and COMPANY expressly intend and agree that class action and representative action procedures shall not be asserted, nor will they apply, in any arbitration pursuant to this Policy/Agreement; (2) EMPLOYEE and COMPANY agree that each will not assert class action or representative action claims against the other in arbitration or otherwise; and (3) each of EMPLOYEE and COMPANY shall only submit their own, individual claims in arbitration and will not seek to represent the interests of any other person."

On August 4, 2006, Iskanian filed a class action complaint against CLS, alleging that it failed to pay overtime, provide meal and rest breaks, reimburse business expenses, provide accurate and complete wage statements, or pay final wages in a timely manner. In its answer to the complaint, CLS asserted among other defenses that all of plaintiff's claims were subject to binding arbitration. CLS moved to compel arbitration, and in March 2007, the trial court granted CLS's motion. Shortly after the trial court's order but before the Court of Appeal's decision in this matter, we decided in *Gentry* that class action waivers in employment arbitration agreements are invalid under certain circumstances. (*Gentry*, *supra*, 42 Cal.4th at pp. 463–464.) The Court of Appeal issued a writ of mandate directing the superior court to reconsider its ruling in light of *Gentry*.

On remand, CLS voluntarily withdrew its motion to compel arbitration, and the parties proceeded to litigate the case. On September 15, 2008, Iskanian filed a consolidated first amended complaint, alleging seven causes of action for Labor Code violations and an unfair competition law (UCL) claim (Bus. & Prof. Code, § 17200 et seq.). Iskanian brought his claims as an individual and putative class representative seeking damages, and also in a representative capacity under the PAGA seeking civil penalties for Labor Code violations. After conducting discovery, Iskanian moved to certify the class, and CLS opposed the motion. On October 29, 2009, the trial court granted Iskanian's motion.

3

On April 27, 2011, the United States Supreme Court issued *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. __ [131 S.Ct. 1740] (*Concepcion*). *Concepcion* invalidated our decision in *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148 (*Discover Bank*), which had restricted consumer class action waivers in arbitration agreements. Soon after, in May 2011, CLS renewed its motion to compel arbitration and dismiss the class claims, arguing that *Concepcion* also invalidated *Gentry*. Iskanian opposed the motion, arguing among other things that *Gentry* was still good law and, in any event, that CLS had waived its right to seek arbitration by withdrawing the original motion to compel arbitration. The trial court ruled in favor of CLS, ordering the case into individual arbitration and dismissing the class claims with prejudice.

The Court of Appeal affirmed, concluding that *Concepcion* invalidated *Gentry*. The court also declined to follow a National Labor Relations Board ruling that class action waivers in adhesive employment contracts violate the National Labor Relations Act. With respect to the PAGA claim, the court understood Iskanian to be arguing that the PAGA does not allow representative claims to be arbitrated, and it concluded that the FAA precludes states from withdrawing claims from arbitration and that PAGA claims must be argued individually, not in a representative action, according to the terms of the arbitration agreement. Finally, the court upheld the trial court's finding that CLS had not waived its right to compel arbitration. We granted review.

## II.

We first address the validity of the class action waiver at issue here and the viability of *Gentry* in light of *Concepcion*.

In *Discover Bank*, we held that when a class arbitration waiver "is found in a consumer contract of adhesion in a setting in which disputes between the contracting parties predictably involve small amounts of damages, and when it is

4

alleged that the party with the superior bargaining power has carried out a scheme to deliberately cheat large numbers of consumers out of individually small sums of money, then . . . the waiver becomes in practice the exemption of the party 'from responsibility for [its] own fraud, or willful injury to the person or property of another.' (Civ. Code, § 1668.) Under these circumstances, such waivers are unconscionable under California law and should not be enforced." (*Discover Bank*, *supra*, 36 Cal.4th at pp. 162–163.)

The high court in *Concepcion* invalidated *Discover Bank* and held that "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1748].) According to *Concepcion*, classwide arbitration "sacrifices the principal advantage of arbitration — its informality — and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." (*Id*. at p. __ [131 S.Ct. at p. 1751].) Class arbitration also "greatly increases risks to defendants" and "is poorly suited to the higher stakes of class litigation" because of the lack of judicial review, "thus rendering arbitration unattractive" to defendants. (*Id*. at p. __ & fn. 8 [131 S.Ct. at p. 1752 & fn. 8].) The court concluded that "[b]ecause it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' [citation], California's *Discover Bank* rule is preempted by the FAA." (*Id*. at p. __ [131 S.Ct. at p. 1753].)

In *Gentry*, we considered a class action waiver and an arbitration agreement in an employment contract. The complaint in *Gentry* alleged that the defendant employer had systematically failed to pay overtime wages to a class of employees. Whereas *Discover Bank* concerned the application of the doctrine of unconscionability, *Gentry* focused on whether the class action waiver would "undermine the vindication of the employees' unwaivable statutory rights" to

5

overtime pay. (*Gentry*, *supra*, 42 Cal.4th at p. 450.) We concluded that a class action waiver may be unenforceable in some circumstances: "[W]hen it is alleged that an employer has systematically denied proper overtime pay to a class of employees and a class action is requested notwithstanding an arbitration agreement that contains a class arbitration waiver, the trial court must consider the factors discussed above: the modest size of the potential individual recovery, the potential for retaliation against members of the class, the fact that absent members of the class may be ill informed about their rights, and other real world obstacles to the vindication of class members' right to overtime pay through individual arbitration. If it concludes, based on these factors, that a class arbitration is likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration, and finds that the disallowance of the class action will likely lead to a less comprehensive enforcement of overtime laws for the employees alleged to be affected by the employer's violations, it must invalidate the class arbitration waiver to ensure that these employees can 'vindicate [their] unwaivable rights in an arbitration forum.' " (*Id.* at pp. 463–464.)

Iskanian contends that *Gentry* survives *Concepcion*. In his briefing, he argues: "The Missouri Supreme Court has interpreted *Concepcion* as holding that *Discover Bank* was preempted because 'it required class arbitration even if class arbitration disadvantaged consumers and was unnecessary for the consumer to obtain a remedy.' (*Brewer v. Missouri Title Loans* (Mo. 2012) 364 S.W.3d 486, 489, 494.) Similarly, a recent analysis of *Concepcion* concludes that 'the unconscionability defense in *Concepcion* "stood as an obstacle," for preemption purposes, because it was a categorical rule that applied to all consumer cases. The sin of the *Discover Bank* rule was that it did not require the claimant to show that the agreement operated as an exculpatory contract on a case-specific basis.'

(Gilles & Friedman, *After Class: Aggregate Litigation in the Wake of AT&T Mobility v. Concepcion* (2012) 79 U. Chi. L. Rev. 623, 651.)"

Iskanian also contends: "*Gentry*, by contrast, 'is not a categorical rule against class action waivers.' [Citation.] *Gentry* explicitly disclaimed any categorical rule . . . . Unlike *Discover Bank*, which held consumer class-action bans 'generally unconscionable' ([*Gentry*, *supra*, 42 Cal.4th] at p. 453), *Gentry* held only that when a statutory right is unwaivable because of its 'public importance,' *id.* at p. 456, banning class actions would in 'some circumstances' 'lead to a de facto waiver and would impermissibly interfere with employees' ability to vindicate unwaivable rights and to enforce the overtime laws.' (*Id.* at p. 457.)" According to Iskanian, "[t]he Courts of Appeal have interpreted *Gentry* to require an evidentiary showing in which a plaintiff bears the burden of demonstrating, based on the *Gentry* factors, that enforcing a class-action ban would result in a waiver of substantive rights."

Contrary to these contentions, however, the fact that *Gentry*'s rule against class waiver is stated more narrowly than *Discover Bank*'s rule does not save it from FAA preemption under *Concepcion*. The high court in *Concepcion* made clear that even if a state law rule against consumer class waivers were limited to "class proceedings [that] are necessary to prosecute small-dollar claims that might otherwise slip through the legal system," it would still be preempted because states cannot require a procedure that interferes with fundamental attributes of arbitration "even if it is desirable for unrelated reasons." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1753]; see *American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. __, __ & fn. 5 [133 S.Ct. 2304, 2312 & fn. 5] (*Italian Colors*).) It is thus incorrect to say that the infirmity of *Discover Bank* was that it did not require a case-specific showing that the class waiver was exculpatory. *Concepcion* holds that *even if* a class waiver is exculpatory in a particular case, it

7

is nonetheless preempted by the FAA. Under the logic of *Concepcion*, the FAA preempts *Gentry*'s rule against employment class waivers.

In his briefing and at oral argument, Iskanian further argued that the *Gentry* rule or a modified *Gentry* rule — whereby a class waiver would be invalid if it meant a de facto waiver of rights and if the arbitration agreement failed to provide suitable alternative means for vindicating employee rights — survives *Concepcion* under our reasoning in *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109 (*Sonic II*). But the *Gentry* rule, whether modified or not, is not analogous to the unconscionability rule set forth in *Sonic II*.

As noted, *Gentry* held that the validity of a class waiver turns on whether "a class arbitration is likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration, and [whether] the disallowance of the class action will likely lead to a less comprehensive enforcement of [labor or employment] laws for the employees alleged to be affected by the employer's violations." (*Gentry*, *supra*, 42 Cal.4th at p. 463.) In other words, if individual arbitration or litigation cannot be designed to approximate the advantages of a class proceeding, then a class waiver is invalid. But *Concepcion* held that because class proceedings interfere with fundamental attributes of arbitration, a class waiver is *not* invalid even if an individual proceeding would be an ineffective means to prosecute certain claims. (See *Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1753].)

The Berman waiver addressed in *Sonic II* is different from a class waiver. As *Sonic II* explained, a Berman waiver implicates a host of statutory protections designed to benefit employees with wage claims against their employers. (*Sonic II*, *supra*, 57 Cal.4th at pp. 1127–1130.) One of those protections is a special administrative hearing (a Berman hearing) that we had held unwaivable in *Sonic-Calabasas A, Inc. v. Moreno* (2011) 51 Cal.4th 659 (*Sonic I*). In *Sonic II*, we

overruled *Sonic I* in light of *Concepcion*, reasoning that "[b]ecause a Berman hearing causes arbitration to be substantially delayed, the unwaivability of such a hearing, even if desirable as a matter of contractual fairness or public policy, interferes with a fundamental attribute of arbitration — namely, its objective ' "to achieve 'streamlined proceedings and expeditious results' " ' " and "is thus preempted by the FAA." (*Sonic II*, *supra*, 57 Cal.4th at p. 1141.) Under the logic of *Sonic II*, which mirrors the logic applied to the *Gentry* rule above, it is clear that because a Berman hearing interferes with fundamental attributes of arbitration, a Berman waiver is not invalid even if the unavailability of a Berman hearing would leave employees with ineffective means to pursue wage claims against their employers.

But *Sonic II* went on to explain that "[t]he fact that the FAA preempts *Sonic I*'s rule requiring arbitration of wage disputes to be preceded by a Berman hearing does not mean that a court applying unconscionability analysis may not consider the value of benefits provided by the Berman statutes, *which go well beyond the hearing itself*." (*Sonic II*, *supra*, 57 Cal.4th at p. 1149, italics added.) The Berman statutes, we observed, provide for fee shifting, mandatory undertaking, and several other protections to assist wage claimants should the wage dispute proceed to litigation. (*Id.* at p. 1146.) "Many of the Berman protections are situated no differently than state laws concerning attorney fee shifting, assistance of counsel, or other rights designed to benefit one or both parties in civil litigation." (*Id.* at p. 1150; see, e.g., Lab. Code, § 1194, subd. (a) [one-way fee shifting for plaintiffs asserting minimum wage and overtime claims].) The value of these protections does not derive from the fact that they exist in the context of a pre-arbitration administrative hearing. Instead, as *Sonic II* made clear, the value of these protections may be realized in "potentially many ways" through arbitration designed in a manner "consistent with its fundamental attributes." (*Sonic II*, at

9

p. 1149; see *ibid.* ["Our rule contemplates that arbitration, no less than an administrative hearing, can be designed to achieved speedy, informal, and affordable resolution of wage claims . . . ."].)

*Sonic II* thus established an unconscionability rule that considers whether arbitration is an effective dispute resolution mechanism for wage claimants without regard to any advantage inherent to a procedural device (a Berman hearing) that interferes with fundamental attributes of arbitration. By contrast, the *Gentry* rule considers whether individual arbitration is an effective dispute resolution mechanism for employees *by direct comparison* to the advantages of a procedural device (a class action) that interferes with fundamental attributes of arbitration. *Gentry*, unlike *Sonic II*, cannot be squared with *Concepcion*.

In practice, *Gentry*'s rule prohibiting class waivers if "a class arbitration is likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration" (*Gentry*, *supra*, 42 Cal.4th at p. 463) regularly resulted in invalidation of class waivers, at least prior to *Concepcion*. (See, e.g., *Olvera v. El Pollo Loco, Inc.* (2009) 173 Cal.App.4th 447, 457; *Sanchez v. Western Pizza Enterprises, Inc.* (2009) 172 Cal.App.4th 154, 170–171; *Franco v. Athens Disposal Co.* (2009) 171 Cal.App.4th 1277, 1298–1299; *Murphy v. Check N' Go of California, Inc.* (2007) 156 Cal.App.4th 138, 148–149; *Jackson v. S.A.W. Entertainment Ltd.* (N.D.Cal. 2009) 629 F.Supp.2d 1018, 1027–1028.) These results are unsurprising since it is unlikely that an individual action could be designed to approximate the inherent leverage that a class proceeding provides to employees with claims against a defendant employer. (See *Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1752].) By contrast, *Sonic II* addressed individual wage claims, not class actions, and there is no reason to think that the value of Berman protections distinct from a Berman hearing itself cannot be achieved by designing an

10

arbitration process that is accessible, affordable, and consistent with fundamental attributes of arbitration. (See *Sonic II*, *supra*, 57 Cal.4th at p. 1147 ["There are potentially many ways to structure arbitration, without replicating the Berman protections, so that it facilitates accessible, affordable resolution of wage disputes. We see no reason to believe that the specific elements of the Berman statutes are the only way to achieve this goal or that employees will be unable to pursue their claims effectively without initial resort to an administrative hearing as opposed to an adequate arbitral forum."].)

In sum, *Sonic II* recognized that the FAA does not prevent states through legislative or judicial rules from addressing the problems of affordability and accessibility of arbitration. But *Concepcion* held that the FAA does prevent states from mandating or promoting procedures incompatible with arbitration. The *Gentry* rule runs afoul of this latter principle. We thus conclude in light of *Concepcion* that the FAA preempts the *Gentry* rule.

### III.

Iskanian contends that even if the FAA preempts *Gentry*, the class action waiver in this case is invalid under the National Labor Relations Act (NLRA). Iskanian adopts the position of the National Labor Relations Board (Board) in *D.R. Horton Inc. & Cuda* (2012) 357 NLRB No. 184 [2012 WL 36274] (*Horton I*) that the NLRA generally prohibits contracts that compel employees to waive their right to participate in class proceedings to resolve wage claims. The Fifth Circuit recently refused to enforce that portion of the NLRB's opinion. (*D.R. Horton, Inc. v. NLRB* (5th Cir. 2013) 737 F.3d 344 (*Horton II*).) We consider below the Board's position and the Fifth Circuit's reasons for rejecting it.

11

## A.

In *Horton I*, the employee, Michael Cuda, a superintendent at Horton, claimed he had been misclassified as exempt from statutory overtime protections under the Fair Labor Standards Act (FLSA).  He sought to initiate a nationwide class arbitration of similarly situated superintendents working for Horton.  Horton asserted that the mutual arbitration agreement (MAA) barred arbitration of collective claims.  Cuda then filed an unfair labor practice charge, and the Board's general counsel issued a complaint.  The complaint alleged that Horton violated section 8(a)(1) of the NLRA by maintaining the MAA provision that said the arbitrator " 'may hear only Employee's individual claims and does not have the authority to fashion a proceeding as a class or collective action or to award relief to a group or class of employees in one arbitration proceeding.' " (*Horton I*, *supra*, 357 NLRB No. 184, p. 1.)  The complaint further alleged that Horton violated NLRA section 8(a)(1) and (4) by maintaining arbitration agreements that required employees, as a condition of employment, " 'to submit all employment related disputes and claims to arbitration . . . , thus interfering with employee access to the [Board].' " (*Horton I*, at p. 2.)  An administrative law judge agreed that the latter but not the former is an unfair labor practice.

On appeal, the Board concluded that (1) the joining together of employees to bring a class proceeding to address wage violations is a form of concerted activity under section 7 of the NLRA (29 U.S.C. § 157); (2) an agreement compelling an employee to waive the right to engage in that activity as a condition of employment is an unfair labor practice under section 8 of the NLRA (*id.*, § 158); and (3) this rule is not precluded by the FAA because it is consistent with the FAA's savings clause (9 U.S.C. § 2) and because the later enacted NLRA prevails over the earlier enacted FAA to the extent there is a conflict.

The Board began its analysis with section 7 of the NLRA, which states that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and *to engage in other concerted activities* for the purpose of collective bargaining *or other mutual aid or protection*, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title." (29 U.S.C. § 157, italics added.)

The Board commented: "It is well settled that 'mutual aid or protection' includes employees' efforts to 'improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship.' *Eastex, Inc. v. NLRB*, 437 U.S. 556, 565–566 (1978). The Supreme Court specifically stated in *Eastex* that Section 7 'protects employees from retaliation by their employer when they seek to improve their working conditions through resort to administrative and judicial forums.' *Id.* at 565–566. The same is equally true of resort to arbitration. [¶] The Board has long held, with uniform judicial approval, that the NLRA protects employees' ability to join together to pursue workplace grievances, including through litigation." (*Horton I*, *supra*, 357 NLRB No. 184, p. 2 [2012 WL 36274 at p. *2].)

The Board then turned to section 8(a)(1) of the NLRA, which says it is an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" section 7. (29 U.S.C. § 158(a)(1).) The Board found, based on the previous discussion, "that the MAA expressly restricts protected activity." (*Horton I*, *supra*, 357 NLRB No. 184, p. 4 [2012 WL 36274 at p. *5].) "That this restriction on the exercise of Section 7 rights is imposed in the form of an agreement between the employee and the

13

employer makes no difference. From its earliest days, the Board, again with uniform judicial approval, has found unlawful employer-imposed, individual agreements that purport to restrict Section 7 rights—including, notably, agreements that employees will pursue claims against their employer only individually." (*Ibid.*)

The Board buttressed this conclusion by reviewing a statute that preceded the NLRA, the Norris LaGuardia Act, which among other things limited the power of federal courts to issue injunctions enforcing "yellow dog" contracts prohibiting employees from joining labor unions. (*Horton I*, *supra*, 357 NLRB No. 184, p. 5 [2012 WL 36274 at p. *7].) The types of activity, "whether undertaken 'singly or in concert,' " that may not be limited by restraining orders or injunctions include " 'aiding any person participating or interested in any labor dispute who . . . is *prosecuting, any action or suit* in any court of the United States or of any State.' 29 U.S.C. § 104(d) (emphasis added)." (*Id*. at pp. 5–6 [2012 WL 36274 at p. *7], fn. omitted.) " 'The law has long been clear that all variations of the venerable "yellow dog contract" are invalid as a matter of law.' Barrow Utilities & Electric, 308 NLRB 4, 11, fn. 5 (1992)." (*Id*. at p. 6 [2012 WL 36274 at p. *8].)

The Board concluded its analysis by finding no conflict between the NLRA and the FAA. Relying on the FAA's savings clause (see 9 U.S.C. § 2 [arbitration agreements are to be enforced "save upon such grounds as exist at law or in equity for the revocation of any contract"]), the Board explained that "[t]he purpose of the FAA was to prevent courts from treating arbitration agreements less favorably than other private contracts. The Supreme Court . . . has made clear that '[w]herever private contracts conflict with [the] functions' of the National Labor Relations Act, 'they obviously must yield or the Act would be reduced to a futility.' *J. I. Case Co.* [(1944)] 321 U.S. [332,] 337. To find that an arbitration agreement must yield to the NLRA is to treat it no worse than any other private

14

contract that conflicts with Federal labor law.  The MAA would equally violate the NLRA if it said nothing about arbitration, but merely required employees, as a condition of employment, to agree to pursue any claims in court against the Respondent solely on an individual basis."  (*Horton I*, *supra*, 357 NLRB No. 184, p. 9 [2012 WL 36274 at p. *11].)

The Board also invoked the principle that arbitration agreements may not require a party to " 'forgo the substantive rights afforded by the statute.' " (*Horton I*, *supra*, 357 NLRB No. 184, p. 9, quoting *Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 26 (*Gilmer*).)  The Board clarified that "[t]he question presented in this case is *not* whether employees can effectively vindicate their statutory rights under the Fair Labor Standards Act in an arbitral forum. [Citation.]  Rather, the issue here is whether the MAA's categorical prohibition of joint, class, or collective federal, state or employment law claims in any forum directly violates the substantive rights vested in employees by Section 7 of the NLRA."  (*Horton*, *supra*, 357 NLRB No. 184, p. 9, fn. omitted [2012 WL 36274 at p. *11].)

The Board recognized a tension between its ruling and *Concepcion*'s statements that the "overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings" and that the "switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality."  (*Concepcion*, *supra*, 563 U.S. at pp. __, __ [131 S.Ct. at pp. 1748, 1751].)  But in the Board's view, "the weight of this countervailing consideration was considerably greater in the context of [*Concepcion*] than it is here for several reasons.  [*Concepcion*] involved the claim that a class-action waiver in an arbitration clause of any contract of adhesion in the State of California was unconscionable.  Here, in contrast, only agreements between employers and their own employees are at

15

stake. As the Court pointed out in [*Concepcion*], such contracts of adhesion in the retail and services industries might cover 'tens of thousands of potential claimants.' Id. at 1752. The average number of employees employed by a single employer, in contrast, is 20, and most class-wide employment litigation, like the case at issue here, involves only a specific subset of an employer's employees. A class-wide arbitration is thus far less cumbersome and more akin to an individual arbitration proceeding along each of the dimensions considered by the Court in [*Concepcion*]—speed, cost, informality, and risk—when the class is so limited in size. 131 S.Ct. at 1751–1752. Moreover, the holding in this case covers only one type of contract, that between an employer and its covered employees, in contrast to the broad rule adopted by the California Supreme Court at issue in [*Concepcion*]. Accordingly, any intrusion on the policies underlying the FAA is similarly limited." (*Horton I*, *supra*, 357 NLRB No. 184, pp. 11–12, fn. omitted [2012 WL 36274 at p. *15, fn. omitted].)

"Finally," the Board said, "even if there were a conflict between the NLRA and the FAA, there are strong indications that the FAA would have to yield under the terms of the Norris-LaGuardia Act. As explained above, under the Norris-LaGuardia Act, a private agreement that seeks to prohibit a 'lawful means [of] aiding any person participating or interested in' a lawsuit arising out of a labor dispute (as broadly defined) is unenforceable, as contrary to the public policy protecting employees' 'concerted activities for . . . mutual aid or protection.' To the extent that the FAA requires giving effect to such an agreement, it would conflict with the Norris-LaGuardia Act. The Norris-LaGuardia Act, in turn— passed 7 years *after* the FAA,—repealed '[a]ll acts and parts of acts in conflict' with the later statute (Section 15)." (*Horton I*, *supra*, 357 NLRB No. 184, p. 12, fn. omitted [2012 WL 36274 at p. *16, fn. omitted].)

16

**B.**

In *Horton II*, the Fifth Circuit disagreed with the Board's ruling that the class action waiver in the MAA was an unfair labor practice. The court recognized precedent holding that " 'the filing of a civil action by employees is protected activity . . . [and] by joining together to file the lawsuit [the employees] engaged in concerted activity.' *127 Rest. Corp.*, 331 NLRB 269, 275–76 (2000). '[A] lawsuit filed in good faith by a group of employees to achieve more favorable terms or conditions of employment is "concerted activity" under Section 7' of the NLRA. *Brady v. Nat'l Football League*, 644 F.3d 661, 673 (8th Cir. 2011)." (*Horton II*, *supra*, 737 F.3d at p. 356.) However, the Fifth Circuit reasoned, "The [FAA] has equal importance in our review. Caselaw under the FAA points us in a different direction than the course taken by the Board." (*Id.* at p. 357.)

Relying on *Concepcion*, the Fifth Circuit rejected the argument that the Board's rule fell within the savings clause of the FAA. A rule that is neutral on its face but is "applied in a fashion that disfavors arbitration" is not a ground that exists "for the revocation of any contract" within the meaning of the savings clause. (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1747].) The Fifth Circuit concluded that the Board's rule, like the rule in *Discover Bank*, was not arbitration neutral. Rather, by substituting class proceedings for individual arbitration, the rule would significantly undermine arbitration's fundamental attributes by requiring procedural formality and complexity, and by creating greater risks to defendants. (*Horton II*, *supra*, 737 F.3d at p. 359, citing *Concepcion*, *supra*, 563 U.S. at pp. __–__ [131 S.Ct. at pp. 1750–1752].)

The court then considered whether "the FAA's mandate has been 'overridden by a contrary congressional command.' " (*CompuCredit v. Greenwood* (2012) 565 U.S. __, __ [132 S.Ct. 665, 669]; see *Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2309].) "If such a command exists, it

17

'will be discoverable in the text,' the statute's 'legislative history,' or 'an "inherent conflict" between arbitration and the [statute's] underlying purposes.' . . . '[T]he relevant inquiry [remains] whether Congress . . . precluded "arbitration or other nonjudicial resolution" of claims.' " (*Horton II*, *supra*, 737 F.3d at p. 360, quoting *Gilmer*, *supra*, 500 U.S. at pp. 26, 28.)  The court found that neither the NLRA's language nor its legislative history showed any indication of prohibiting a class action waiver in an arbitration agreement.  (*Horton II*, at pp. 360–361.)

Next, the Fifth Circuit considered whether there is "an inherent conflict" between the FAA and the NLRA.  (*Horton II*, *supra*, 737 F.3d at p. 361.)  It noted that NLRA policy itself "favors arbitration" and permits unions to waive the right of employees to litigate statutory employment claims in favor of arbitration. (*Ibid.*)  The court also noted that "the right to proceed collectively cannot protect vindication of employees' statutory rights under the ADEA or FLSA because a substantive right to proceed collectively has been foreclosed by prior decisions." (*Ibid.*, citing *Gilmer*, *supra*, 500 U.S. at p. 32 and *Carter v. Countrywide Credit Industries, Inc.* (5th Cir. 2004) 362 F.3d 294, 298.)  "The right to collective action also cannot be successfully defended on the policy ground that it provides employees with greater bargaining power.  'Mere inequality in bargaining power . . . is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context.'  *Gilmer*, 500 U.S. at 33.  The end result is that the Board's decision creates either a right that is hollow or one premised on an already-rejected justification." (*Horton II*, at p. 361.)

Further, the court observed that "the NLRA was enacted and reenacted prior to the advent in 1966 of modern class action practice.  [Citation.]  We find limited force to the argument that there is an inherent conflict between the FAA and NLRA when the NLRA would have to be protecting a right of access to a procedure that did not exist when the NLRA was (re)enacted." (*Horton II*, *supra*,

737 F.3d at p. 362, fn. omitted.)  For the reasons above, the court held that the NLRA does not foreclose enforcement of a class action waiver in an arbitration agreement.  (*Horton II*, at p. 363.)

## C.

We agree with the Fifth Circuit that, in light of *Concepcion*, the Board's rule is not covered by the FAA's savings clause.  *Concepcion* makes clear that even if a rule against class waivers applies equally to arbitration and nonarbitration agreements, it nonetheless interferes with fundamental attributes of arbitration and, for that reason, disfavors arbitration in practice.  (*Concepcion*, *supra*, 563 U.S. at pp. __–__ [131 S.Ct. at pp. 1750–1752].)  Thus, if the Board's rule is not precluded by the FAA, it must be because the NLRA conflicts with and takes precedence over the FAA with respect to the enforceability of class action waivers in employment arbitration agreements.  As the Fifth Circuit explained, neither the NLRA's text nor its legislative history contains a congressional command prohibiting such waivers.  (*Horton II*, *supra*, 737 F.3d at pp. 360–361.)

We also agree that there is no inherent conflict between the FAA and the NLRA as that term is understood by the United States Supreme Court.  It is significant that "the NLRA was enacted and reenacted prior to the advent in 1966 of modern class action practice."  (*Horton II*, *supra*, 737 F.3d at p. 362.)  To be sure, "the task of defining the scope of § 7 'is for the Board to perform in the first instance as it considers the wide variety of cases that come before it' " (*NLRB v. City Disposal Systems Inc.* (1984) 465 U.S. 822, 829), and the forms of concerted activity protected by the NLRA are not necessarily limited to those that existed when the NLRA was enacted in 1935 or reenacted in 1947.  However, in *Italian Colors*, where the high court held that federal antitrust laws do not preclude enforcement of a class action waiver in an arbitration agreement, the high court found it significant that "[t]he Sherman and Clayton Acts make no mention of

19

class actions.  In fact, they were enacted decades before the advent of Federal Rule of Civil Procedure 23 . . . ."  (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2309].)  Here as well, like the Fifth Circuit, "[w]e find limited force to the argument that there is an inherent conflict between the FAA and NLRA when the NLRA would have to be protecting a right of access to a procedure that did not exist when the NLRA was (re)enacted."  (*Horton II*, at p. 362, fn. omitted.)

Furthermore, as the high court stated in *Italian Colors*:  "In *Gilmer*, *supra*, we had no qualms in enforcing a class waiver in an arbitration agreement even though the federal statute at issue, the Age Discrimination in Employment Act, expressly permitted collective actions.  We said that statutory permission did ' "not mean that individual attempts at conciliation were intended to be barred." ' "  *Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2311].)  Thus, the high court has held that the explicit authorization of class actions in the Age Discrimination in Employment Act (see 29 U.S.C. § 626(b), referencing, for purposes of enforcement 29 U.S.C. § 216 [providing for employee class actions as a remedy for Fair Labor Standard Act violations]) does not bar enforcement of a class waiver in an arbitration agreement.  This holding reinforces our doubt that the NLRA's general protection of concerted activity, which makes no reference to class actions, may be construed as an implied bar to a class action waiver.

We do not find persuasive the Board's attempt to distinguish its rule from *Discover Bank* on the basis that employment arbitration class actions tend to be smaller than consumer class actions and thus "far less cumbersome and more akin to an individual arbitration proceeding."  (*Horton I*, *supra*, 357 NLRB No. 184, p. 12 [2012 WL 36274 at p. *15].)  Nothing in *Concepcion* suggests that its rule upholding class action waivers, which relied significantly on the incompatibility between the formality of class proceedings and the informality of arbitration (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1751]), depends on the size

20

of the class involved. Nor does the limitation of a class action waiver to disputes between employers and employees mitigate the conflict between the Board's rule and the FAA under the reasoning of *Concepcion*.

We thus conclude, in light of the FAA's " 'liberal federal policy favoring arbitration' " (*Concepcion*, *supra*, 563 U.S. at p.__ [131 S.Ct. at p. 1745]), that sections 7 and 8 the NLRA do not represent "a contrary congressional command" ' overriding the FAA's mandate. (*CompuCredit v. Greenwood*, *supra*, 565 U.S. at p. __ [132 S.Ct. at p. 669.) This conclusion is consistent with the judgment of all the federal circuit courts and most of the federal district courts that have considered the issue. (See *Sutherland v. Ernst & Young, LLP* (2d Cir. 2013) 726 F.3d 290, 297 fn. 8; *Owen v. Bristol Care, Inc.* (8th Cir. 2013) 702 F.3d 1050, 1053–1055; *Delock v. Securitas Sec. Servs. USA, Inc.* (E.D.Ark. 2012) 883 F.Supp.2d 784, 789–790; *Morvant v. P.F. Chang's China Bistro, Inc.* (N.D.Cal. 2012) 870 F.Supp.2d 831, 844–845; *Jasso v. Money Mart Express, Inc.* (N.D.Cal. 2012) 879 F.Supp.2d 1038, 1048–1049; but see *Herrington v. Waterstone Mortg. Corp.* (W.D.Wis. Mar. 16, 2012) No. 11-cv-779-bbc [2012 WL 1242318, at p. *5] [defendant advances no persuasive argument that the Board interpreted the NLRA incorrectly].)

Our conclusion does not mean that the NLRA imposes no limits on the enforceability of arbitration agreements. Notably, while upholding the class waiver in *Horton II*, the Fifth Circuit affirmed the Board's determination that the arbitration agreement at issue violated section 8(a)(1) and (4) of the NLRA insofar as it contained language that would lead employees to reasonably believe they were prohibited from filing unfair labor practice charges with the Board. (*Horton II*, *supra*, 737 F.3d at pp. 363–364.) Moreover, the arbitration agreement in the present case, apart from the class waiver, still permits a broad range of collective activity to vindicate wage claims. CLS points out that the agreement here is less

21

restrictive than the one considered in *Horton*:  The arbitration agreement does not prohibit employees from filing joint claims in arbitration, does not preclude the arbitrator from consolidating the claims of multiple employees, and does not prohibit the arbitrator from awarding relief to a group of employees.  The agreement does not restrict the capacity of employees to "discuss their claims with one another, pool their resources to hire a lawyer, seek advice and litigation support from a union, solicit support from other employees, and file similar or coordinated individual claims."  (*Horton I*, *supra*, 357 NLRB No. 184, p. 6 [2012 WL 36274 at p. *8]; cf. *Italian Colors*, *supra*, 570 U.S. at p. __, fn. 4 [133 S. Ct. at p. 2311, fn. 4 [making clear that its holding applies only to class action waivers and not to provisions barring "other forms of cost sharing"].)  We have no occasion to decide whether an arbitration agreement that more broadly restricts collective activity would run afoul of section 7.

## IV.

Code of Civil Procedure section 1281.2 provides that one ground for denying a petition to compel arbitration is that "[t]he right to compel arbitration has been waived by the petitioner."  Iskanian contends that CLS waived its right to arbitration by failing to diligently pursue arbitration.  We disagree.

"As our decisions explain, the term 'waiver' has a number of meanings in statute and case law.  [Citation.]  While 'waiver' generally denotes the voluntary relinquishment of a known right, it can also refer to the loss of a right as a result of a party's failure to perform an act it is required to perform, regardless of the party's intent to relinquish the right.  [Citations.]  In the arbitration context, '[t]he term "waiver" has also been used as a shorthand statement for the conclusion that a contractual right to arbitration has been lost.'  [Citation.]"  (*St. Agnes Medical*

22

*Center v. PacifiCare of California* (2003) 31 Cal.4th 1187, 1195, fn. 4 (*St. Agnes Medical Center*).)

"California courts have found a waiver of the right to demand arbitration in a variety of contexts, ranging from situations in which the party seeking to compel arbitration has previously taken steps inconsistent with an intent to invoke arbitration [citations] to instances in which the petitioning party has unreasonably delayed in undertaking the procedure. [Citations.] The decisions likewise hold that the 'bad faith' or 'willful misconduct' of a party may constitute a waiver and thus justify a refusal to compel arbitration. [Citation.]" (*Davis v. Blue Cross of Northern California* (1979) 25 Cal.3d 418, 425–426.) The fact that the party petitioning for arbitration has participated in litigation, short of a determination on the merits, does not by itself constitute a waiver. (*St. Agnes Medical Center*, *supra*, 31 Cal.4th at p. 1203.)

We have said the following factors are relevant to the waiver inquiry: " ' "(1) whether the party's actions are inconsistent with the right to arbitrate; (2) whether 'the litigation machinery has been substantially invoked' and the parties 'were well into preparation of a lawsuit' before the party notified the opposing party of an intent to arbitrate; (3) whether a party either requested arbitration enforcement close to the trial date or delayed for a long period before seeking a stay; (4) whether a defendant seeking arbitration filed a counterclaim without asking for a stay of the proceedings; (5) 'whether important intervening steps [e.g., taking advantage of judicial discovery procedures not available in arbitration] had taken place'; and (6) whether the delay 'affected, misled, or prejudiced' the opposing party." ' " (*St. Agnes Medical Center*, *supra*, 31 Cal.4th at p. 1196.)

In light of the policy in favor of arbitration, "waivers are not to be lightly inferred and the party seeking to establish a waiver bears a heavy burden of

proof." (*St. Agnes Medical Center*, *supra*, 31 Cal.4th at p. 1195.) "Generally, the determination of waiver is a question of fact, and the trial court's finding, if supported by sufficient evidence, is binding on the appellate court. [Citation.] 'When, however, the facts are undisputed and only one inference may reasonably be drawn, the issue is one of law and the reviewing court is not bound by the trial court's ruling.' " (*Id.*at p. 1196.)

In the present case, CLS initially filed a timely petition to compel arbitration in response to Iskanian's complaint, which included class action claims. After the trial court granted the petition, this court issued *Gentry*, which restricted the enforceability of class waivers, and the Court of Appeal remanded the matter to the trial court to determine whether *Gentry* affected the ruling. Rather than further litigate the petition to compel arbitration, CLS withdrew the petition and proceeded to litigate the claim and resist Iskanian's move to certify a class. The parties engaged in discovery, both as to the merits and on the class certification issue. In October of 2009, the trial court granted Iskanian's motion to certify the class. In May of 2011, shortly after the Supreme Court filed *Concepcion*, which cast *Gentry* into doubt, CLS renewed its petition to compel arbitration. The trial court granted the petition.

CLS contends that it has never acted inconsistently with its right to arbitrate. It initially petitioned to compel arbitration and then abandoned arbitration only when *Gentry* made clear that further petition would be futile. It moved to compel arbitration again as soon as a change in the law made clear the motion had a chance of succeeding. In response, Iskanian contends that California law does not recognize futility as a legitimate ground for delaying the assertion of the right to arbitration and that even if there were such an exception, it should not apply here because even after *Gentry*, CLS's petition to compel arbitration had some chance of success.

24

This court has not explicitly recognized futility as a ground for delaying a petition to compel arbitration. (Compare *Fisher v. A.G. Becker Paribas Inc.* (9th Cir. 1986) 791 F.2d 691, 697 [delay in asserting arbitration rights excusable when prevailing "intertwining doctrine" made such an assertion futile until Supreme Court rejected the doctrine].) But futility as grounds for delaying arbitration is implicit in the general waiver principles we have endorsed. A factor relevant to the waiver inquiry is whether the party asserting arbitration has acted inconsistently with the right to arbitrate (see *St. Agnes Medical Center*, *supra*, 31 Cal.4th at p. 1196) or whether a delay was "unreasonable" (*Lewis v. Fletcher Jones Motor Cars, Inc.* (2012) 205 Cal.App.4th 436, 446 (*Fletcher Jones*)). The fact that a party initially successfully moved to compel arbitration and abandoned that motion only after a change in the law made the motion highly unlikely to succeed weighs in favor of finding that the party has not waived its right to arbitrate.

Iskanian points out that *Gentry* did not purport to invalidate all class waivers in wage and hour cases, but only in those instances when a class action or arbitration "is likely to be a significantly more effective practical means of vindicating the rights of the affected employees than individual litigation or arbitration." (*Gentry*, *supra*, 42 Cal.4th at p. 463.) In this case, however, neither party has ever disputed that the class action waiver at issue would not have survived *Gentry*. This case is therefore distinguishable from cases finding unexcused delay where the party asserting arbitration had some real chance of succeeding in compelling individual arbitration under extant law applicable to class waivers. (See *Fletcher Jones*, *supra*, 205 Cal.App.4th at p. 448 [*Discover Bank*'s holding that consumer class action waivers are prohibited in the case of small damages claims did not preclude class waiver where plaintiff sought $19,000 in damages].)

25

Iskanian contends that because he spent three years attempting to obtain class certification, including considerable effort and expense on discovery, waiver should be found on the ground that the delay in the start of arbitration prejudiced him. We have said that "prejudice . . . is critical in waiver determinations." (*St. Agnes Medical Center*, *supra*, 31 Cal.4th at p. 1203.) But "[b]ecause merely participating in litigation, by itself, does not result in . . . waiver, courts will not find prejudice where the party opposing arbitration shows only that it incurred court costs and legal expenses." (*Ibid.*) "Prejudice typically is found only where the petitioning party's conduct has substantially undermined this important public policy or substantially impaired the other side's ability to take advantage of the benefits and efficiencies of arbitration. [¶] For example, courts have found prejudice where the petitioning party used the judicial discovery processes to gain information about the other side's case that could not have been gained in arbitration [citations]; where a party unduly delayed and waited until the eve of trial to seek arbitration [citation]; or where the lengthy nature of the delays associated with the petitioning party's attempts to litigate resulted in lost evidence [citation]." (*Id.* at p. 1204.)

Some courts have interpreted *St. Agnes Medical Center* to allow consideration of the expenditure of time and money in determining prejudice where the delay is unreasonable. In *Burton v. Cruise* (2010) 190 Cal.App.4th 939, for example, the court reasoned that "a petitioning party's conduct in stretching out the litigation process itself may cause prejudice by depriving the other party of the advantages of arbitration as an 'expedient, efficient and cost-effective method to resolve disputes.' [Citation.] Arbitration loses much, if not all, of its value if undue time and money is lost in the litigation process preceding a last-minute petition to compel." (*Id.* at p. 948.) Other courts have likewise found that unjustified delay, combined with substantial expenditure of time and money,

26

deprived the parties of the benefits of arbitration and was sufficiently prejudicial to support a finding of waiver to arbitrate. (See, e.g., *Hoover v. American Income Life Ins. Co.* (2012) 206 Cal.App.4th 1193, 1205; *Roberts v. El Cajon Motors, Inc.* (2011) 200 Cal.App.4th 832, 845–846; *Adolph v. Coastal Auto Sales, Inc.* (2010) 184 Cal.App.4th 1443, 1451; *Guess? Inc. v. Superior Court* (2000) 79 Cal.App.4th 553, 558; *Sobremonte v. Superior Court* (1998) 61 Cal.App.4th 980, 996; but see *Groom v. Health Net* (2000) 82 Cal.App.4th 1189, 1197 [excluding time and expense from the calculus of prejudice].)

These cases, however, do not support Iskanian's position. In each of them, substantial expense and delay were caused by the *unreasonable* or *unjustified* conduct of the party seeking arbitration. In this case, the delay was reasonable in light of the state of the law at the time and Iskanian's own opposition to arbitration. Where, as here, a party promptly initiates arbitration and then abandons arbitration because it is resisted by the opposing party and foreclosed by existing law, the mere fact that the parties then proceed to engage in various forms of pretrial litigation does not compel the conclusion that the party has waived its right to arbitrate when a later change in the law permits arbitration.

Moreover, the case before us is not one where "the petitioning party used the judicial discovery processes to gain information about the other side's case that could not have been gained in arbitration" or "where the lengthy nature of the delays associated with the petitioning party's attempts to litigate resulted in lost evidence." (*St. Agnes Medical Center*, *supra*, 31 Cal.4th at p. 1204.) No such prejudice has been shown here. As CLS points out, without contradiction by Iskanian, the discovery it obtained while the case was in court consisted of Iskanian's deposition and 77 pages of documents pertaining to his individual wage claim. Because the arbitration agreement itself provides for "reasonable discovery," there is no indication that CLS obtained any material information

27

through pretrial discovery that it could not have obtained through arbitral discovery.

In sum, Iskanian does not demonstrate that CLS's delay in pursuing arbitration was unreasonable or that pretrial proceedings have resulted in cognizable prejudice. We conclude that CLS has not waived its right to arbitrate.

## V.

As noted, the arbitration agreement requires the waiver not only of class actions but of "representative actions." There is no dispute that the contract's term "representative actions" covers representative actions brought under the Private Attorneys General Act. (Lab. Code, § 2968 et seq.; all subsequent undesignated statutory references are to this code.) We must decide whether such waivers are permissible under state law and, if not, whether the FAA preempts a state law rule prohibiting such waivers.

## A.

Before enactment of the PAGA in 2004, several statutes provided civil penalties for violations of the Labor Code. The Labor Commissioner could bring an action to obtain such penalties, with the money going into the general fund or into a fund created by the Labor and Workforce Development Agency (Agency) for educating employers. (See § 210 [civil penalties for violating various statutes related to the timing and manner in which wages are to be paid]; § 225.5 [civil penalties for violating various statutes related to withholding wages due]; Stats. 1983, ch. 1096.) Some Labor Code violations were criminal misdemeanors. (See §§ 215, 216, 218.)

The PAGA addressed two problems. First, the bill sponsors observed that "many Labor Code provisions are unenforced because they are punishable only as criminal misdemeanors, with no civil penalty or other sanction attached. Since district attorneys tend to direct their resources to violent crimes and other public

28

priorities, Labor Code violations rarely result in criminal investigations and prosecutions." (Sen. Judiciary Com., Analysis of Sen. Bill No. 796 (Reg. Sess. 2003–2004) as amended Apr. 22, 2003, p. 5.) The solution was to enact civil penalties for Labor Code violations "significant enough to deter violations." (*Ibid.*) For Labor Code violations for which no penalty is provided, the PAGA provides that the penalties are generally $100 for each aggrieved employee per pay period for the initial violation and $200 per pay period for each subsequent violation. (§ 2699, subd. (f)(2).)

The second problem was that even when statutes specified civil penalties, there was a shortage of government resources to pursue enforcement. The legislative history discussed this problem at length. Evidence gathered by the Assembly Committee on Labor and Employment indicated that the Department of Industrial Relations (DIR) "was failing to effectively enforce labor law violations. Estimates of the size of California's 'underground economy' — businesses operating outside the state's tax and licensing requirements — ranged from 60 to 140 billion dollars a year, representing a tax loss to the state of three to six billion dollars annually. Further, a U.S. Department of Labor study of the garment industry in Los Angeles, which employs over 100,000 workers, estimated the existence of over 33,000 serious and ongoing wage violations by the city's garment industry employers, but that DIR was issuing fewer than 100 wage citations per year for all industries throughout the state. [¶] Moreover, evidence demonstrates that the resources dedicated to labor law enforcement have not kept pace with the growth of the economy in California." (Assembly Com. on Labor and Employment, Analysis of Sen. Bill No. 796 (Reg. Sess. 2003–2004) as amended July 2, 2003, p. 4.)

We summarized the Legislature's response to this problem in *Arias v. Superior Court* (2009) 46 Cal.4th 969, 980–981 (*Arias*): "In September 2003, the

Legislature enacted the Labor Code Private Attorneys General Act of 2004 [citations]. The Legislature declared that adequate financing of labor law enforcement was necessary to achieve maximum compliance with state labor laws, that staffing levels for labor law enforcement agencies had declined and were unlikely to keep pace with the future growth of the labor market, and that it was therefore in the public interest to allow aggrieved employees, acting as private attorneys general, to recover civil penalties for Labor Code violations, with the understanding that labor law enforcement agencies were to retain primacy over private enforcement efforts. (Stats. 2003, ch. 906, § 1.)

"Under this legislation, an 'aggrieved employee' may bring a civil action personally and on behalf of other current or former employees to recover civil penalties for Labor Code violations. (Lab. Code, § 2699, subd. (a).) Of the civil penalties recovered, 75 percent goes to the Labor and Workforce Development Agency, leaving the remaining 25 percent for the 'aggrieved employees.' (*Id.*, § 2699, subd. (i).)

"Before bringing a civil action for statutory penalties, an employee must comply with Labor Code section 2699.3. (Lab. Code, § 2699, subd. (a).) That statute requires the employee to give written notice of the alleged Labor Code violation to both the employer and the Labor and Workforce Development Agency, and the notice must describe facts and theories supporting the violation. (*Id.*, § 2699.3, subd. (a).) If the agency notifies the employee and the employer that it does not intend to investigate . . . , or if the agency fails to respond within 33 days, the employee may then bring a civil action against the employer. (*Id.*, § 2699.3, subd. (a)(2)(A).) If the agency decides to investigate, it then has 120 days to do so. If the agency decides not to issue a citation, or does not issue a citation within 158 days after the postmark date of the employee's notice, the

employee may commence a civil action. (*Id.*, § 2699.3, subd. (a)(2)(B).)" (*Arias, supra*, 46 Cal.4th at pp. 980–981, fn. omitted.)

In *Arias*, the defendants argued that if the PAGA were not "construed as requiring representative actions under the act to be brought as class actions," then a defendant could be subjected to lawsuits by multiple plaintiffs raising a common claim, none of whom would be bound by a prior judgment in the defendant's favor because they were not parties to a prior lawsuit. (*Arias, supra*, 46 Cal.4th at p. 985.) We rejected this due process concern on the ground that "the judgment in [a PAGA representative] action is binding not only on the named employee plaintiff but also on government agencies and any aggrieved employee not a party to the proceeding." (*Ibid.*) We reached this conclusion by elucidating the legal characteristics of a PAGA representative action: "An employee plaintiff suing . . . under the [PAGA] does so as the proxy or agent of the state's labor law enforcement agencies. . . . In a lawsuit brought under the act, the employee plaintiff represents the same legal right and interest as state labor law enforcement agencies — namely, recovery of civil penalties that otherwise would have been assessed and collected by the Labor Workforce Development Agency. [Citations.] . . . . Because collateral estoppel applies not only against a party to the prior action in which the issue was determined, but also against those for whom the party acted as an agent or proxy [citations], a judgment in an employee's action under the act binds not only that employee but also the state labor law enforcement agencies.

"Because an aggrieved employee's action under the [PAGA] functions as a substitute for an action brought by the government itself, a judgment in that action binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government. The act authorizes a representative action only for the purpose of seeking statutory penalties for Labor

31

Code violations (Lab. Code, § 2699, subds. (a), (g)), and an action to recover civil penalties 'is fundamentally a law enforcement action designed to protect the public and not to benefit private parties' (*People v. Pacific Land Research Co.* (1977) 20 Cal.3d 10, 17). When a government agency is authorized to bring an action on behalf of an individual or in the public interest, and a private person lacks an independent legal right to bring the action, a person who is not a party but who is represented by the agency is bound by the judgment as though the person were a party. (Rest.2d Judgments, § 41, subd. (1)(d), com. d, p. 397.) Accordingly, with respect to the recovery of civil penalties, nonparty employees as well as the government are bound by the judgment in an action brought under the act, and therefore defendants' due process concerns are to that extent unfounded." (*Arias*, *supra*, 46 Cal.4th at p. 986.)

The civil penalties recovered on behalf of the state under the PAGA are distinct from the statutory damages to which employees may be entitled in their individual capacities. Case law has clarified the distinction "between a request for statutory penalties provided by the Labor Code for employer wage-and-hour violations, which were recoverable directly by employees well before the [PAGA] became part of the Labor Code, and a demand for 'civil penalties,' previously enforceable only by the state's labor law enforcement agencies. An example of the former is section 203, which obligates an employer that willfully fails to pay wages due an employee who is discharged or quits to pay the employee, in addition to the unpaid wages, a penalty equal to the employee's daily wages for each day, not exceeding 30 days, that the wages are unpaid. [Citation.] Examples of the latter are section 225.5, which provides, in addition to any other penalty that may be assessed, an employer that unlawfully withholds wages in violation of certain specified provisions of the Labor Code is subject to a civil penalty in an enforcement action initiated by the Labor Commissioner in the sum of $100 per

32

employee for the initial violation and $200 per employee for subsequent or willful violations, and section 256, which authorizes the Labor Commissioner to 'impose a civil penalty in an amount not exceeding 30 days [*sic*] pay as waiting time under the terms of Section 203.' " (*Caliber Bodyworks, Inc. v. Superior Court* (2005) 134 Cal.App.4th 365, 377–378, fns. omitted; see *Murphy v. Kenneth Cole Productions, Inc.* (2007) 40 Cal.4th 1094, 1114 [distinguishing premium pay under section 226.7 from a civil penalty in determining the applicable statute of limitations].)

A PAGA representative action is therefore a type of *qui tam* action. "Traditionally, the requirements for enforcement by a citizen in a qui tam action have been (1) that the statute exacts a penalty; (2) that part of the penalty be paid to the informer; and (3) that, in some way, the informer be authorized to bring suit to recover the penalty." (*Sanders v. Pacific Gas & Elec. Co.* (1975) 53 Cal.App.3d 661, 671 (*Sanders*).) The PAGA conforms to these traditional criteria, except that a portion of the penalty goes not only to the citizen bringing the suit but to all employees affected by the Labor Code violation. The government entity on whose behalf the plaintiff files suit is always the real party in interest in the suit. (See *In re Marriage of Biddle* (1997) 52 Cal.App.4th 396, 399.)

Although the PAGA was enacted relatively recently, the use of qui tam actions is venerable, dating back to colonial times, and several such statutes were enacted by the First Congress. (See *Vermont Agency of Natural Resources v. United States ex rel. Stevens* (2000) 529 U.S. 765, 776–777.) The Federal False Claims Act, allowing individuals to share the recovery achieved by the reporting of false claims, originated during the Civil War. (See *United States ex rel. Marcus v. Hess* (1943) 317 U.S. 537, 539–540; 31 U.S.C § 3730.) The qui tam plaintiff under the Federal False Claims Act has standing in federal court under article III of the United States Constitution, even though the plaintiff has suffered no injury

33

in fact, because that statute "can reasonably be regarded as effecting a partial assignment of the Government's damages claim." (*Stevens*, at p. 773.) California has more recently authorized qui tam actions for the recovery of false claims against the state treasury. (Gov. Code, § 12652, subd. (c), added by Stats. 1987, ch. 1420, § 1, p. 5239.) In addition, there are earlier examples of qui tam actions under California law. (See, e.g., *Sanders*, *supra*, 53 Cal.App.3d at p. 671 [noting qui tam provision in Political Reform Act of 1974].)

## B.

With this background, we first examine whether an employee's right to bring a PAGA action is waivable. The unwaivability of certain statutory rights "derives from two statutes that are themselves derived from public policy. First, Civil Code section 1668 states: 'All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.' 'Agreements whose object, directly or indirectly, is to exempt [their] parties from violation of the law are against public policy and may not be enforced.' (*In re Marriage of Fell* (1997) 55 Cal.App.4th 1058, 1065.) Second, Civil Code section 3513 states, 'Anyone may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement.' " (*Armendariz v. Foundation Health Psychcare Services, Inc.* (2000) 24 Cal.4th 83, 100 (*Armendariz*).)

These statutes compel the conclusion that an employee's right to bring a PAGA action is unwaivable. Section 2699, subdivision (a) states: "Notwithstanding any other provision of law, any provision of this code that provides for a civil penalty to be assessed and collected by the Labor and

34

Workforce Development Agency . . . for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees pursuant to the procedures specified in Section 2699.3." As noted, the Legislature's purpose in enacting the PAGA was to augment the limited enforcement capability of the Labor and Workforce Development Agency by empowering employees to enforce the Labor Code as representatives of the Agency. Thus, an agreement by employees to waive their right to bring a PAGA action serves to disable one of the primary mechanisms for enforcing the Labor Code. Because such an agreement has as its "object, . . . indirectly, to exempt [the employer] from responsibility for [its] own . . . violation of law," it is against public policy and may not be enforced. (Civ. Code, § 1668.).)

Such an agreement also violates Civil Code section 3513's injunction that "a law established for a public reason cannot be contravened by a private agreement." The PAGA was clearly established for a public reason, and agreements requiring the waiver of PAGA rights would harm the state's interests in enforcing the Labor Code and in receiving the proceeds of civil penalties used to deter violations. Of course, employees are free to choose whether or not to bring PAGA actions when they are aware of Labor Code violations. (See *Armendariz*, *supra*, 24 Cal.4th at p. 103, fn. 8 [waivers freely made after a dispute has arisen are not necessarily contrary to public policy].) But it is contrary to public policy for an employment agreement to eliminate this choice altogether by requiring employees to waive the right to bring a PAGA action before any dispute arises.

CLS argues that the arbitration agreement at issue here prohibits only representative claims, not individual PAGA claims for Labor Code violations that an employee suffered. Iskanian contends that the PAGA, which authorizes an

aggrieved employee to file a claim "on behalf of himself or herself *and* other current or former employees" (§ 2699, subd. (a), italics added), does not permit an employee to file an individual claim. (Compare *Reyes v. Macy's, Inc.* (2011) 202 Cal.App.4th 1119, 1123–1124 [agreeing with Iskanian's position] with *Quevedo v. Macy's, Inc.* (C.D.Cal. 2011) 798 F.Supp.2d 1122, 1141–1142 [an employee may bring an individual PAGA action and waive the right to bring it on behalf of other employees].) But whether or not an individual claim is permissible under the PAGA, a prohibition of *representative* claims frustrates the PAGA's objectives. As one Court of Appeal has observed: "[A]ssuming it is authorized, a single-claimant arbitration under the PAGA for individual penalties will not result in the penalties contemplated under the PAGA to punish and deter employer practices that violate the rights of numerous employees under the Labor Code. That plaintiff and other employees might be able to bring individual claims for Labor Code violations in separate arbitrations does not serve the purpose of the PAGA, even if an individual claim has collateral estoppel effects. (*Arias*, *supra*, 46 Cal.4th at pp. 985–987.) Other employees would still have to assert their claims in individual proceedings." (*Brown v. Ralphs Grocery Co.* (2011) 197 Cal.App.4th 489, 502, fn. omitted.)

We conclude that where, as here, an employment agreement compels the waiver of representative claims under the PAGA, it is contrary to public policy and unenforceable as a matter of state law.

## C.

Notwithstanding the analysis above, a state law rule, however laudable, may not be enforced if it is preempted by the FAA. As *Concepcion* made clear, a state law rule may be preempted when it "stands as an obstacle to the accomplishment of the FAA's objectives." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1748].) We conclude that the rule against PAGA waivers does not

36

frustrate the FAA's objectives because, as explained below, the FAA aims to ensure an efficient forum for the resolution of *private* disputes, whereas a PAGA action is a dispute between an employer and the state Labor and Workforce Development Agency.

The FAA's focus on private disputes finds expression in the statute's text: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce *to settle by arbitration a controversy thereafter arising out of such contract or transaction . . .* shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (9 U.S.C. § 2, italics added.) Although the italicized language may be read to indicate that the FAA applies only to disputes about contractual rights, not statutory rights (see Friedman, *The Lost Controversy Limitation of the Federal Arbitration Act* (2012) 46 U.Rich. L.Rev. 1005, 1037–1045), the high court has found the FAA applicable to statutory claims between parties to an arbitration agreement (see, e.g., *Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 635–637). Even so, however, the statutory phrase "a controversy thereafter arising out of such contract or transaction" is most naturally read to mean a dispute about the respective rights and obligations of parties in a contractual relationship.

The FAA's focus on private disputes is further revealed in its legislative history, which shows that the FAA's primary object was the settlement of ordinary commercial disputes. (See J. Hearings on Sen. Bill No. 1005 and H.Res. No. 646 before the Subcommittees of the Committees on the Judiciary, 68th Cong., 1st Sess., 15 (1924) at p. 29 [testimony of FAA drafter Julius Henry Cohen that the act will merely make enforceable the customs of trade associations to arbitrate disputes]; *id.* at p. 7 [testimony of Charles Bernheimer, Chairman of Com. on Arbitration, N.Y. State Chamber of Commerce, that FAA is designed to resolve

37

"ordinary everyday trade disputes" between merchants].)  There is no indication that the FAA was intended to govern disputes between the government in its law enforcement capacity and private individuals.  Furthermore, although qui tam citizen actions on behalf of the government were well established at the time the FAA was enacted (see *ante*, at p. 33), there is no mention of such actions in the legislative history and no indication that the FAA was concerned with limiting their scope.  (Compare *Concepcion*, *supra*, 563 U.S. at pp. __–__ [131 S.Ct. at pp. 1751–1752] [noting that class arbitration was not envisioned by the Congress that enacted the FAA].)

Consistent with this understanding, the United States Supreme Court's FAA jurisprudence — with one exception discussed below — consists entirely of disputes involving the parties' *own* rights and obligations, not the rights of a public enforcement agency.  (See, e.g., *Italian Colors*, *supra*, 570 U.S. at p. __ [133 S. Ct. at p. 2308] [class action by merchants for excessive credit card fees charged in violation of antitrust laws]; *Marmet Health Care Center, Inc. v. Brown* (2012) 565 U.S. __, __ [132 S.Ct. 1201, 1202–1203] [wrongful death action]; *Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1744] [class action suit for damages over fraudulent practices]; *Rent-A-Center West, Inc. v. Jackson* (2010) 561 U.S. 63, __ [130 S.Ct. 2772, 2775] [employment discrimination suit]; *Stolt-Nielsen S.A. v. AnimalFeeds International Corp.* (2010) 559 U.S. 662, 667 [antitrust dispute involving price fixing and supracompetitive pricing]; *Preston v. Ferrer* (2008) 552 U.S. 346, 350 [action by attorney to recover fees from former client]; *Buckeye Check Cashing, Inc. v. Cardegna* (2006) 546 U.S. 440, 443 [class action by borrowers against lender for alleged usurious loans]; *Green Tree Financial Corp. v. Bazzle* (2003) 539 U.S. 444, 449 [class action damages suit by borrowers against lender for violations of South Carolina law]; *Doctor's Associates, Inc. v. Casarotto* (1996) 517 U.S. 681, 683 [contract and fraud claims related to franchise

agreement]; *Rodriguez de Quijas v. Shearson/Am. Exp.* (1989) 490 U.S. 477, 478–479 [various statutory causes of actions by investors against broker over investments "turned sour"]; *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior Univ.* (1989) 489 U.S. 468, 470–471 [action for fraud and breach of contract]; *Perry v. Thomas* (1987) 482 U.S. 483, 484–485 [suit for breach of contract, conversion, and breach of fiduciary duty arising from employment relationship]; *Shearson/American Express Inc. v. McMahon* (1987) 482 U.S. 220, 222–223 [suit against brokerage firm by clients alleging various statutory causes of action]; *Mitsubishi Motors v. Soler Chrysler-Plymouth* (1985) 473 U.S. 614, 619–620 [contract, defamation, and antitrust dispute between automobile companies]; *Southland Corp. v. Keating* (1984) 465 U.S. 1, 4 [class action suit for fraud, breach of contract, breach of fiduciary duty, and violation of state disclosure requirements related to franchise agreement]; *Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 23–24 [employment age discrimination suit]; *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.* (1983) 460 U.S. 1, 6–7 [contract dispute].)

The one case in which the high court has considered the enforcement of an arbitration agreement against the government does not support CLS's contention that the FAA preempts a PAGA action. In *EEOC v. Waffle House, Inc.* (2002) 534 U.S. 279 (*Waffle House*), the high court held that an employment arbitration agreement governed by the FAA does not prevent the Equal Employment Opportunity Commission (EEOC) from suing an employer on behalf of an employee bound by that agreement for victim-specific relief, such as reinstatement and back pay. The court based its conclusion primarily on the fact that the EEOC was not a party to the arbitration agreement. (*Id.* at pp. 288–289.) *Waffle House* further noted that the EEOC was not a proxy for the individual employee, that the EEOC could prosecute the action without the employee's consent, and that the

39

employee did not exercise control over the litigation. (*Id.* at p. 291.) Whereas *Waffle House* involved a suit by the government seeking to obtain victim-specific relief on behalf of an employee bound by the arbitration agreement, this case involves an employee bound by an arbitration agreement bringing suit on behalf of the government to obtain remedies other than victim-specific relief, i.e., civil penalties paid largely into the state treasury. Nothing in *Waffle House* suggests that the FAA preempts a rule prohibiting the waiver of this kind of qui tam action on behalf of the state for such remedies.

Simply put, a PAGA claim lies outside the FAA's coverage because it is not a dispute between an employer and an employee arising out of their contractual relationship. It is a dispute between an employer and the *state*, which alleges directly or through its agents — either the Labor and Workforce Development Agency or aggrieved employees — that the employer has violated the Labor Code. Through his PAGA claim, Iskanian is seeking to recover civil penalties, 75 percent of which will go to the state's coffers. We emphasized in *Arias* that "an action to recover civil penalties 'is fundamentally a law enforcement action designed to protect the public and not to benefit private parties' "; that "[i]n a lawsuit brought under the [PAGA], the employee plaintiff represents the same legal right and interest as state labor law enforcement agencies"; and that "an aggrieved employee's action under the [PAGA] functions as a substitute for an action brought by the government itself." (*Arias*, *supra*, 46 Cal.4th at p. 986.) The fact that any judgment in a PAGA action is binding on the government confirms that the state is the real party in interest. (*Ibid.*) It is true that "a person may not bring a PAGA action unless he or she is 'an aggrieved employee' (§ 2699, subd. (a))" (conc. opn., *post*, at p. 6), but that does not change the character of the litigant or the dispute. As Justice Chin correctly observes, "*every* PAGA action, whether seeking penalties for Labor Code violations as to

40

only one aggrieved employee — the plaintiff bringing the action — or as to other employees as well, is a representative action on behalf of the state." (*Id.* at p. 4.)

Of course, any employee is free to forgo the option of pursuing a PAGA action. But it is against public policy for an employment agreement to deprive employees of this option altogether, before any dispute arises. (*Ante*, at pp. 34–36.) The question is whether this public policy contravenes the FAA. Nothing in the text or legislative history of the FAA nor in the Supreme Court's construction of the statute suggests that the FAA was intended to limit the ability of states to enhance their public enforcement capabilities by enlisting willing employees in qui tam actions. Representative actions under the PAGA, unlike class action suits for damages, do not displace the bilateral arbitration of private disputes between employers and employees over their respective rights and obligations toward each other. Instead, they directly enforce *the state's* interest in penalizing and deterring employers who violate California's labor laws. In crafting the PAGA, the Legislature could have chosen to deputize citizens who were not employees of the defendant employer to prosecute qui tam actions. The Legislature instead chose to limit qui tam plaintiffs to willing employees who had been aggrieved by the employer in order to avoid "private plaintiff abuse." (Sen. Judiciary Comm., Analysis of Sen. Bill No. 796 (Reg. Sess. 2003–2004) as amended Apr. 22, 2003, p. 7.) This arrangement likewise does not interfere with the FAA's policy goal.

Our opinion today would not permit a state to circumvent the FAA by, for example, deputizing employee A to bring a suit for the individual damages claims of employees B, C, and D. This pursuit of victim-specific relief by a party to an arbitration agreement on behalf of other parties to an arbitration agreement would be tantamount to a private class action, whatever the designation given by the Legislature. Under *Concepcion*, such an action could not be maintained in the face of a class waiver. Here, importantly, a PAGA litigant's status as "the proxy

or agent" of the state (*Arias*, *supra*, 46 Cal.4th at p. 986) is not merely semantic; it reflects a PAGA litigant's substantive role in enforcing our labor laws on behalf of state law enforcement agencies. Our FAA holding applies specifically to a state law rule barring predispute waiver of an employee's right to bring an action that can only be brought by the state or its representatives, where any resulting judgment is binding on the state and any monetary penalties largely go to state coffers.

Further, the high court has emphasized that " 'courts should assume that "the historic police powers of the States" are not superseded "unless that was the clear and manifest purpose of Congress." ' (*Arizona v. United States* (2012) 567 U.S. __, __ [132 S.Ct. 2492, 2501]; see *Chamber of Commerce v. Whiting* (2011) 563 U.S. __, __ [131 S.Ct. 1968, 1985] ['Our precedents "establish that a high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act." [Citation.]'].)" (*Sonic II*, *supra*, 57 Cal.4th at p. 1154.) There is no question that the enactment and enforcement of laws concerning wages, hours, and other terms of employment is within the state's historic police power. (See *Metropolitan Life Ins. Co. v. Massachusetts* (1985) 471 U.S. 724, 756 [" 'States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.' "]; *Kerr's Catering Service v. Dept. of Industrial Relations* (1962) 57 Cal.2d 319, 326–327.) Moreover, how a state government chooses to structure *its own* law enforcement authority lies at the heart of state sovereignty. (See *Printz v. United States* (1997) 521 U.S. 898, 928 ["It is an essential attribute of the State's retained sovereignty that they remain independent and autonomous within their proper sphere of authority."].) We can discern in the FAA no purpose, much less a clear and manifest purpose, to curtail the ability of states to supplement their

enforcement capability by authorizing willing employees to seek civil penalties for Labor Code violations traditionally prosecuted by the state.

In sum, the FAA aims to promote arbitration of claims belonging to the private parties to an arbitration agreement. It does not aim to promote arbitration of claims belonging to a government agency, and that is no less true when such a claim is brought by a statutorily designated proxy for the agency as when the claim is brought by the agency itself. The fundamental character of the claim as a public enforcement action is the same in both instances. We conclude that California's public policy prohibiting waiver of PAGA claims, whose sole purpose is to vindicate the Labor and Workforce Development Agency's interest in enforcing the Labor Code, does not interfere with the FAA's goal of promoting arbitration as a forum for private dispute resolution.

### D.

CLS contends that the PAGA violates the principle of separation of powers under the California Constitution. Iskanian says this issue was not raised in CLS's answer to the petition for review and is not properly before us. Because the constitutionality of the PAGA is directly pertinent to the issue of whether a PAGA waiver is contrary to state public policy, and because the parties have had a reasonable opportunity to brief this issue, we will decide the merits of this question. (See Cal. Rules of Court, rule 8.516(b)(1), (2).)

The basis of CLS's argument is found in *County of Santa Clara v. Superior Court* (2010) 50 Cal.4th 35 (*County of Santa Clara*). There we reconsidered our earlier holding in *People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740 (*Clancy*), which appeared to categorically bar public entities from hiring private counsel on a contingent fee basis to prosecute public nuisances. In the context of a disputed injunction to close an adult bookstore, this court reasoned that private counsel acting as a public prosecutor must be "absolutely neutral" and must

43

engage in a "delicate weighing of values" that would be upset if the prosecutor had a financial interest in the prosecution. (*Id.* at pp. 748–749.)

In *County of Santa Clara*, we clarified that *Clancy*'s "absolute prohibition on contingent-fee arrangements" applies only to cases involving a constitutional "liberty interest" or "the right of an existing business to continue operation," and not to all public nuisance cases. (*County of Santa Clara*, *supra*, 50 Cal.4th at p. 56.) We recognized, as we did in *Clancy*, that contingent fee representation was appropriate in "ordinary civil cases" in which a government entity's own economic interests were at stake. (*County of Santa Clara*, at p. 50; see *Clancy*, *supra*, 39 Cal.3d at p. 748.) Whereas the suit in *Clancy* was akin to a criminal prosecution, with possible criminal penalties and severe civil penalties, we said the public nuisance suit at issue in *County of Santa Clara*, which involved abatement of lead paint, fell somewhere in between an ordinary civil case and a criminal prosecution. (*County of Santa Clara*, at p. 55.) We held that for such cases, the interest in prosecutorial neutrality is sufficiently protected when private counsel, although having a pecuniary interest in litigation, is "subject to the supervision and control of government attorneys" so that "the discretionary decisions vital to an impartial prosecution are made by neutral attorneys." (*Id.* at p. 59.)

CLS contends that the PAGA runs afoul of our holding in *County of Santa Clara* by authorizing financially interested private citizens to prosecute claims on the state's behalf without governmental supervision. CLS further contends that because *County of Santa Clara* dealt with regulation of the legal profession, which is the province of this court, the PAGA violates the principle of separation of powers under the California Constitution. (See Cal. Const., art. III, § 3; *Merco Constr. Engineers, Inc. v. Municipal Court* (1978) 21 Cal.3d 724, 731–732.) We disagree.

44

"[T]he separation of powers doctrine does not create an absolute or rigid division of functions." (*Lockyer v. City and County of San Francisco* (2004) 33 Cal.4th 1055, 1068.) Rather, "[t]he substantial interrelatedness of the three branches' actions is apparent and commonplace: the judiciary passes upon the constitutional validity of legislative and executive actions, the Legislature enacts statutes that govern the procedures and evidentiary rules applicable in judicial and executive proceedings, and the Governor appoints judges and participates in the legislative process through the veto power. Such interrelationship, of course, lies at the heart of the constitutional theory of 'checks and balances' that the separation of powers doctrine is intended to serve." (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52–53.)

In considering CLS's challenge, we note that it would apply not only to the PAGA but to all qui tam actions, including the California False Claims Act, which authorizes the prosecution of claims on behalf of government entities without government supervision. (See Gov. Code, § 12652, subd. (c).) No court has applied the rule in *Clancy* or *County of Santa Clara* to such actions, and our case law contains no indication that the enactment of qui tam statutes is anything but a legitimate exercise of legislative authority. The Legislature is charged with allocating scarce budgetary resources (see *Professional Engineers in California Government v. Schwarzenegger* (2010) 50 Cal.4th 989, 1010–1011), which includes the provision of resources to the state executive branch for prosecution and law enforcement. Qui tam actions enhance the state's ability to use such scarce resources by enlisting willing citizens in the task of civil enforcement. Indeed, the choice often confronting the Legislature is not between prosecution by a financially interested private citizen and prosecution by a neutral prosecutor, but between a private citizen suit and no suit at all. As noted, the lack of government resources to enforce the Labor Code led to a legislative choice to deputize and

45

incentivize employees uniquely positioned to detect and prosecute such violations through the PAGA.

This legislative choice does not conflict with *County of Santa Clara*. Our holding in that case applies to circumstances in which a government entity retains a private law firm or attorney as outside counsel. A "fundamental" reason to worry about neutrality in that context is that such an attorney, like an attorney directly employed by the government, "has the vast power of the government available to him; he must refrain from abusing that power by failing to act evenhandedly." (*Clancy*, *supra*, 39 Cal.3d at p. 746.) By contrast, a litigant who brings a qui tam action on behalf of the government generally does not have access to such power. The qui tam litigant has only his or her own resources and may incur significant cost if unsuccessful. The PAGA, by deputizing employee plaintiffs to enforce the Labor Code on behalf of the Labor and Workforce Development Agency, does not present the same risks of abuse as when a city or county hires outside counsel to do its bidding.

Moreover, our rule in *County of Santa Clara* involves minimal if any interference with legislative or executive functions of state or local government. The rule simply requires government entities to supervise the attorneys they choose to hire to pursue public nuisance actions. By contrast, a rule disallowing qui tam actions would significantly interfere with a legitimate exercise of legislative authority aimed at accomplishing the important public purpose of augmenting scarce government resources for civil prosecutions.

Because of these differences, *Clancy* and *County of Santa Clara* do not apply beyond the context of attorneys hired by government entities as independent contractors. There is no conflict between the rule in those cases and the PAGA. Accordingly, we reject CLS's argument that the PAGA violates the separation of powers principle under the California Constitution.

46

## VI.

Having concluded that CLS cannot compel the waiver of Iskanian's representative PAGA claim but that the agreement is otherwise enforceable according to its terms, we next consider how the parties will proceed. Although the arbitration agreement can be read as requiring arbitration of individual claims but not of representative PAGA claims, neither party contemplated such a bifurcation. Iskanian has sought to litigate all claims in court, while CLS has sought to arbitrate the individual claims while barring the PAGA representative claim altogether. In light of the principles above, neither party can get all that it wants. Iskanian must proceed with bilateral arbitration on his individual damages claims, and CLS must answer the representative PAGA claims in some forum. The arbitration agreement gives us no basis to assume that the parties would prefer to resolve a representative PAGA claim through arbitration.

This raises a number of questions: (1) Will the parties agree on a single forum for resolving the PAGA claim and the other claims? (2) If not, is it appropriate to bifurcate the claims, with individual claims going to arbitration and the representative PAGA claim to litigation? (3) If such bifurcation occurs, should the arbitration be stayed pursuant to Code of Civil Procedure section 1281.2? (See *Cronus Investments, Inc. v. Concierge Services* (2005) 35 Cal.4th 376, 388–391 [California Arbitration Act rather than FAA procedures apply to arbitrations brought in California courts].) The parties have not addressed these questions and may do so on remand. The parties may also address CLS's contention that the

47

PAGA claims are time-barred, as well as Iskanian's response that CLS has forfeited this contention and cannot raise it on appeal.

## CONCLUSION

Because the Court of Appeal held that the entire arbitration agreement, including the PAGA waiver, should be enforced, we reverse the judgment and remand the cause for proceedings consistent with this opinion.


LIU, J.

WE CONCUR:  CANTIL-SAKAUYE, C. J.
CORRIGAN, J.
KENNARD, J.*

_____

*     Retired Associate Justice of the Supreme Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CONCURRING OPINION BY CHIN, J.**

I agree that the rule of *Gentry v. Superior Court* (2007) 42 Cal.4th 443 (*Gentry*), which was announced by a bare four-to-three majority of this court, is inconsistent with and invalid under the decisions of the United States Supreme Court interpreting the Federal Arbitration Act (FAA) (9 U.S.C. § 1 et seq.). I also agree that the class action waiver in this case is not unlawful under the National Labor Relations Act, that defendant CLS Transportation Los Angeles, LLC, did not waive its right to arbitrate, that the arbitration agreement is invalid insofar as it purports to preclude plaintiff Arshavir Iskanian from bringing in any forum a representative action under the Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.), and that this conclusion is not inconsistent with the FAA. However, as explained below, I do not endorse all of the majority's reasoning and discussion, including its endorsement of dicta in *Sonic-Calabasas A, Inc. v. Moreno* (2013) 57 Cal.4th 1109 (*Sonic II*). I therefore concur in the judgment.

## I. BOTH *GENTRY*'S RULE AND *SONIC II*'S DICTA ARE INVALID UNDER THE FAA.

As noted above, I agree with the majority that *Gentry*'s rule may not stand under the United States Supreme Court's construction of the FAA. Indeed, for that very reason, I joined Justice Baxter's well-reasoned dissent in *Gentry*, which explained that neither the FAA nor California law permits courts to "elevate a

mere judicial affinity for class actions as a beneficial device for implementing the wage laws above the policy expressed by both Congress and our own Legislature that voluntary individual agreements to arbitrate . . . should be enforced according to their terms." (*Gentry*, *supra*, 42 Cal.4th at p. 477 (dis. opn. of Baxter, J.).)

I do not agree, however, that the approach to unconscionability a majority of this court described in dicta in *Sonic II* may "be squared" with the high court's FAA decisions. (Maj. opn., *ante*, at p. 10.) That approach, as my dissent in *Sonic II* explained, is preempted by the FAA as the high court construed that act in *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. __ [131 S.Ct. 1740] (*Concepcion*), *American Express Co. v. Italian Colors Restaurant* (2013) 570 U.S. __ [133 S.Ct. 2304] (*Italian Colors*), and several other decisions. (*Sonic II*, *supra*, 57 Cal.4th at pp. 1184-1192 (dis. opn. of Chin, J.).) Nothing has occurred since we issued *Sonic II* to change my view.

Indeed, the majority's discussion in this case further reveals the invalidity under federal law of *Sonic II*'s dicta. According to the majority, under that dicta, whether the arbitration procedure to which the parties have agreed is unconscionable turns not on whether it permits recovery, but on whether it is, in a court's view, less "effective . . . for wage claimants" than a "dispute resolution mechanism" that includes the procedures and protections "the Berman statutes" prescribe. (Maj. opn., *ante*, at pp. 9-10.) However, the high court has established that the FAA does not permit courts to invalidate arbitration agreements based on the view that the procedures they set forth would " 'weaken[] the protections afforded in the substantive law to would-be complainants.' [Citation.]" (*Green Tree Financial Corp.-Ala. v. Randolph* (1990) 531 U.S. 79, 89-90.) Consistent with this principle, in *Italian Colors*, the court recently held that an arbitration agreement may be not invalidated based on *proof* that its waiver of a *congressionally approved* mechanism — the class action — would make pursuing

2

a federal antitrust claim prohibitively expensive.  (*Italian Colors*, *supra*, 570 U.S. at pp. __ [133 S.Ct. at pp. 2310-2312].)  A fortiori, an arbitration agreement may not be invalidated based on a court's subjective view that the agreement's waiver of the Berman procedures and protections would render arbitration less "effective . . . for wage claimants" than a "dispute resolution mechanism" that includes those procedures and protections.  According to the high court, the FAA is "a congressional declaration of a liberal federal policy favoring arbitration agreements, *notwithstanding any state substantive or procedural policies to the contrary*."  (*Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24, italics added.)  To quote Justice Baxter's dissent in *Gentry*, it does not permit courts to "elevate a mere judicial affinity for" the Berman dispute resolution mechanism "as a beneficial device for implementing the wage laws above the policy expressed by . . . Congress . . . that voluntary individual agreements to arbitrate . . . should be enforced according to their terms."  (*Gentry*, *supra*, 42 Cal.4th at p. 477 (dis. opn. of Baxter, J.).)  I therefore do not join the majority opinion insofar as it suggests that the approach to unconscionability described in *Sonic II*'s dicta is valid under the FAA.

## II.  THE PAGA WAIVER IS UNENFORCEABLE.

Under PAGA, an "aggrieved employee" — i.e., "any person who was employed by" someone alleged to have violated the Labor Code "and against whom one or more of the alleged violations was committed" — may bring a civil action against the alleged violator to recover civil penalties for Labor Code violations both as to himself or herself and as to "other current or former employees." (Lab. Code, § 2699, subds. (a), (c).)[1]  As we have explained, an

---

[1] All further unlabeled statutory references are to the Labor Code.

aggrieved employee's PAGA action " 'is fundamentally a law enforcement action' " that "substitute[s] for an action brought by the government itself." (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 986.) The employee-plaintiff "acts as the proxy or agent of state labor law enforcement agencies, representing the same legal right and interest as those agencies" and seeking statutory civil penalties "that otherwise would be sought by" those agencies. (*Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993, 1003.) By statute, 75 percent of the penalties "recovered by aggrieved employees" under PAGA goes to the Labor and Workforce Development Agency, and only 25 percent goes to "the aggrieved employees." (§ 2699, subd. (i).) Accordingly, *every* PAGA action, whether seeking penalties for Labor Code violations as to only one aggrieved employee — the plaintiff bringing the action — or as to other employees as well, is a representative action on behalf of the state.

As relevant, the arbitration agreement here provides: "[E]xcept as otherwise required under applicable law, (1) EMPLOYEE and COMPANY expressly intend and agree that class action and *representative* action procedures shall not be asserted, nor will they apply, in any arbitration pursuant to this Policy/Agreement; (2) EMPLOYEE and COMPANY agree that each will not assert class action or *representative* action claims against the other *in arbitration or otherwise*; and (3) each of EMPLOYEE and COMPANY shall only submit their own, individual claims in arbitration and will not seek to represent the interests of any other person." (Italics added.) Because, as explained above, *all* PAGA claims are representative actions, these provisions purport to preclude Iskanian from bringing a PAGA action *in any forum*. To this extent, the arbitration provision is, for reasons the majority states, invalid under California law. (Maj. opn., *ante*, at pp. 34-36.)

4

I agree with the majority that this conclusion is not inconsistent with the FAA, but my reasoning differs from the majority's. Although the FAA generally requires enforcement of arbitration agreements according to their terms, the high court has recognized an exception to this requirement for "a provision in an arbitration agreement forbidding the assertion of certain statutory rights." (*Italian Colors*, *supra*, 570 U.S. at p. __ [133 S.Ct. at p. 2310]; see *Mitsubishi Motors v. Soler Chrysler–Plymouth* (1985) 473 U.S. 614, 637 ["so long as the prospective litigant effectively may vindicate its statutory cause of action in the arbitral forum, the statute will continue to serve both its remedial and deterrent function"].) Accordingly, the conclusion that the arbitration agreement here is invalid insofar as it forbids Iskanian from asserting his statutory right under PAGA in any forum does not run afoul of the FAA.

The majority takes a different route in finding no preemption. It first correctly observes that the FAA applies by its terms only to provisions in contracts " 'to settle by arbitration a controversy thereafter arising out of such contract.' " (Maj. opn., *ante*, at p. 37, quoting 9 U.S.C. § 2.) Based on this language, the majority then declares that a PAGA claim "lies" completely "outside the FAA's coverage because it is not a dispute between an employer and an employee arising out of their contractual relationship." (Maj. opn., *ante*, at p. 40.) It is, instead, merely "a dispute between an employer and the *state*, which alleges directly or through its agents — either the Labor and Workforce Development Agency or aggrieved employees — that the employer has violated the Labor Code." (Maj. opn., *ante*, at p. 40.)

For several reasons, I question the majority's analysis. First, I disagree that a PAGA claim is not "a dispute between an employer and an employee arising out of their contractual relationship." (Maj. opn., *ante*, at p. 40.) As noted above, a person may not bring a PAGA action unless he or she is "an aggrieved employee"

5

(§ 2699, subd. (a)), i.e., a person "who was employed by" the alleged Labor Code violator and "against whom" at least one of the alleged violations "was committed" (§ 2699, subd. (c)).  In other words, as the majority explains, by statute, only "employees who ha[ve] been aggrieved by the employer" may bring PAGA actions.  (Maj. opn., *ante*, at p. 41.)  Thus, although the scope of a PAGA action may extend beyond the contractual relationship between the plaintiff-employee and the employer — because the plaintiff may recover civil penalties for violations as to other employees — the dispute arises, first and fundamentally, out of that relationship.

Second, to find no FAA preemption in this case, we need not adopt a novel theory, devoid of case law support, that renders the FAA completely inapplicable to PAGA claims.  Under the majority's view that PAGA claims "lie[] outside the FAA's coverage" because they are not disputes between employers and employees "arising out of their contractual relationship" (maj. opn., *ante*, at p. 40), the state may, without constraint by the FAA, simply ban arbitration of PAGA claims and declare agreements to arbitrate such claims unenforceable.  I do not subscribe to that view, for which the majority offers no case law support.  By contrast, as explained above, there *is* case law support — from the high court itself — for the conclusion that the arbitration agreement here is unenforceable because it purports to preclude Iskanian from bringing a PAGA action *in any forum*.  We should limit ourselves to an analysis firmly grounded in high court precedent, rather than needlessly adopt a novel theory that renders the FAA completely inapplicable.

Third, contrary to the majority's assertion, *EEOC v. Waffle House, Inc.* (2002) 534 U.S. 279 (*Waffle House*), to the extent it is relevant, actually *does* "suggest[] that the FAA preempts" the majority's rule.  The question there was whether, under the FAA, an agreement between an employer and an employee to arbitrate employment-related disputes precluded the Equal Employment

Opportunity Commission (EEOC), which was not "a party to" the arbitration agreement and had never "agreed to arbitrate its claims," from pursuing victim-specific relief in a judicial enforcement action. (*Waffle House*, *supra*, at p. 294.) The court said "no," explaining that nothing in the FAA "place[s] any restriction on a nonparty's choice of a judicial forum" (*Waffle House*, *supra*, at p. 289) or requires a "nonparty" to arbitrate claims it has not agreed to arbitrate (*id.* at p. 294). Because Iskanian *is* a party to the arbitration agreement in this case, this holding is inapposite. What is apposite in *Waffle House* is the court's statement that the FAA "ensures the enforceability of private agreements to arbitrate." (*Waffle House*, *supra*, 534 U.S. at p. 289.) This statement, which simply reiterates what the court has said "on numerous occasions" (*Stolt-Nielsen S.A. v. AnimalFeeds International Corp.* (2010) 559 U.S. 662, 682), casts considerable doubt on the majority's view that the FAA permits either California or its courts to declare private agreements to arbitrate PAGA claims categorically unenforceable.

Finally, under other high court precedent, there is good reason to doubt the majority's suggestion that the FAA places no limit on "the ability of states to enhance their public enforcement capabilities by enlisting willing employees in qui tam actions." (Maj. opn., *ante*, at p. 41.) When the high court recently held in *Concepcion* that the FAA prohibits courts from conditioning enforcement of arbitration agreements on the availability of classwide arbitration procedures, even if such procedures "are necessary to prosecute small-dollar claims that might otherwise slip through the legal system," it explained: "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1753].) In earlier decisions, the high court broadly explained that the FAA "is a congressional declaration of a liberal federal policy favoring arbitration agreements, *notwithstanding any state substantive or procedural policies to the contrary*"

7

(*Moses H. Cone Hospital v. Mercury Constr. Corp.*, *supra*, 460 U.S. at p. 24, italics added), which "withdr[aws] the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration" (*Southland Corp. v. Keating* (1984) 465 U.S. 1, 10).  Thus, "if contracting parties agree to include" certain claims "within the issues to be arbitrated, the FAA ensures that their agreement will be enforced according to its terms *even if a rule of state law would otherwise exclude such claims from arbitration.*" (*Mastrobuono v. Shearson Lehman Hutton, Inc.* (1995) 514 U.S. 52, 58, italics added.)  In other words, "[w]hen state law prohibits outright the arbitration of a particular type of claim, the analysis is straightforward: The conflicting rule is displaced by the FAA." (*Concepcion*, *supra*, 563 U.S. at p. __ [131 S.Ct. at p. 1747].)  These binding pronouncements indicate that the FAA may, in fact, place a limit on the ability of a state, for policy reasons, to "enhance" its public enforcement capabilities by authorizing employees who have contractually agreed to arbitrate their statutory PAGA claims to ignore that agreement and pursue those claims in court as the state's "representatives."  (Maj. opn., ante, at p. 41.)

However, as explained above, requiring an arbitration provision to preserve *some* forum for bringing PAGA actions does not exceed that limit.  I therefore concur in the judgment.

                                                                                                    CHIN, J.

I CONCUR:

BAXTER, J.

8

**CONCURRING AND DISSENTING OPINION BY WERDEGAR, J.**


I join the court's conclusions as to Arshavir Iskanian's Private Attorneys General Act claims, which are not foreclosed by his employment contract or the Federal Arbitration Act (FAA). I disagree with the separate holding that the mandatory class action and class arbitration waivers in Iskanian's employment contract are lawful. Eight decades ago, Congress made clear that employees have a right to engage in collective action and that contractual clauses purporting to strip them of those rights as a condition of employment are illegal. What was true then is true today. I would reverse the Court of Appeal's decision in its entirety.

## I.

Employment contracts prohibiting collective action, first known as " 'ironclads,' " date to the 19th century. (Ernst, *The Yellow-dog Contract and Liberal Reform, 1917-1932* (1989) 30 Lab. Hist. 251, 252 (*The Yellow-dog Contract*).) Confronted with collective efforts by workers to agitate for better terms and conditions of employment, employers responded by conditioning employment on the promise not to join together with fellow workers in a union. (*Lincoln Union v. Northwestern Co.* (1949) 335 U.S. 525, 534; Silverstein, *Collective Action, Property Rights and Law Reform: The Story of the Labor Injunction* (1993) 11 Hofstra Lab. L.J. 97, 100.) This practice was "so obnoxious

to workers that they gave these required agreements the name of 'yellow dog contracts.' " (*Lincoln Union*, at p. 534.)

"Recognizing that such agreements in large part represent the superior economic position of the employer by virtue of which the theoretical freedom of an employee to refuse assent was illusory, and that such agreements therefore emptied of meaning the 'right of collective bargaining,' " state legislatures and Congress sought to stem the practice, enacting statutes that prohibited conditioning employment on a compulsory contractual promise not to unionize. (Frankfurter & Greene, The Labor Injunction (1930) p. 146.) These efforts were initially unsuccessful; first state courts, and then the *Lochner*-era[1] Supreme Court, struck down the bans as an infringement on liberty of contract. (*Coppage v. Kansas* (1915) 236 U.S. 1, 9-14; *Adair v. United States* (1908) 208 U.S. 161, 172-176; Frankfurter & Greene, at pp. 146-148; Ernst, *The Yellow-dog Contract*, *supra*, 30 Lab. Hist. at p. 252.) When the Supreme Court gave a clear imprimatur to yellow-dog contracts in *Hitchman Coal & Coke Co. v. Mitchell* (1917) 245 U.S. 229, upholding an injunction against collective organizing efforts on the ground that the contracts granted employers a property right secure from union interference, the use of contractual bans on collective action blossomed. (Frankfurter & Greene, at pp. 148-149; Ernst, at pp. 253-256.) Through the use of such terms, "[a]ny employer willing to compel employee acquiescence could effectively foreclose all union organizational efforts directed at his business." (Winter, Jr., *Labor Injunctions and Judge-made Labor Law: The Contemporary Role of Norris-LaGuardia* (1960) 70 Yale L.J. 70, 72, fn. 14.)

---

[1] *Lochner v. New York* (1905) 198 U.S. 45.

2

In the 1930's, Congress tried again to outlaw contractual bans on collective action. A bill drafted by then-Professor Felix Frankfurter and others[2] was swiftly and overwhelmingly approved in both houses and enacted as the Norris-LaGuardia Act of 1932. (Bremner, *The Background of the Norris-La Guardia Act* (1947) 9 The Historian 171, 174-175.) Section 2 of the act declared as the public policy of the United States employees' right to engage in collective activity, free from employer restraint or coercion: "Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, . . . *it is necessary that he have full freedom of association*, self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that *he shall be free from the interference, restraint, or coercion of employers of labor*, or their agents, in the designation of such representatives or in self-organization or *in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . .*" (29 U.S.C. § 102, italics added.) Congress recognized the inability of a "single laborer, standing alone, confronted with such far-reaching, overwhelming concentration of employer power" to "negotiate or to exert any influence over the fixing of his wages or the hours and conditions of his labor," the necessary corrective to be "[t]he right of wage earners to organize and to act

---

[2]    See Frankfurter & Greene, The Labor Injunction, *supra*, page 226 and footnote 61; *id.* at pages 279-288 (draft bill); Fischl, *Self, Others, and Section 7: Mutualism and Protected Protest Activities Under the National Labor Relations Act* (1989) 89 Colum. L.Rev. 789, 846-849.

3

jointly in questions affecting wages [and the] conditions of labor," and, as the solution, "specific legislative action" to preserve workers' "freedom in association to influence the fixing of wages and working conditions." (Sen.Rep. No. 163, 72d Cong., 1st Sess., p. 9 (1932); see generally *id.*, at pp. 9-14.) Arguing for passage, the act's cosponsor, Senator George Norris, explained the measure was needed to end a regime in which "the laboring man . . . . must singly present any grievance he has." (Remarks of Sen. Norris, Debate on Sen. No. 935, 72d Cong., 1st Sess., 75 Cong. Rec. 4504 (1932).)

To that end, section 3 of the Norris-LaGuardia Act was "designed to outlaw the so-called yellow-dog contract." (H.R.Rep. No. 669, 72d Cong., 1st Sess., p. 6 (1932); accord, Sen.Rep. No. 163, *supra*, at pp. 15-16.) "[T]he vice of such contracts, which are becoming alarmingly widespread," was that they rendered collective action and unions effectively impossible; "[i]ndeed, that is undoubtedly their purpose, and the purpose of the organizations of employers opposing" the Norris-LaGuardia Act. (H.R.Rep. No. 669, at p. 7.) If such contracts, requiring a waiver of workers' rights of free association, were given enforcement in the courts, "collective action would be impossible so far as the employee is concerned by virtue of the necessity of signing the character of contract condemned, which prevents a man from joining with his fellows for collective action; and the statement . . . that 'it has long been recognized that employees are entitled to organize for the purpose of securing the redress of grievances and to promote agreements with employers relating to rates of pay and conditions of work' would become an empty statement of historical fact." (*Ibid.*, quoting *Texas & N. O. R. Co. v. Ry. Clerks* (1930) 281 U.S. 548, 570.) Accordingly, the Norris-LaGuardia Act declared yellow dog contracts "to be contrary to the public policy of the United States" and unenforceable in any court of the United States. (29 U.S.C. § 103.)

4

Three years later, Congress expanded on these proscriptions in the National Labor Relations Act (commonly known as the Wagner Act after its author, Sen. Robert F. Wagner). (Pub.L. No. 74-198 (July 5, 1935) 49 Stat. 449, codified as amended at 29 U.S.C. §§ 151-169.) The public policy underlying the act was the same as that motivating the Norris-LaGuardia Act: "protecting the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment or other mutual aid or protection." (29 U.S.C. § 151.) To ensure that end, the Wagner Act granted employees, inter alia, "the right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." (29 U.S.C. § 157 (also known as section 7).)[3] Employers were forbidden "to interfere with, restrain, or coerce employees in the exercise of" their right to engage in concerted, collective activity. (29 U.S.C. § 158(a)(1).) Inter alia, these provisions were a "logical and imperative extension of that section of the Norris-La Guardia Act which makes the yellow-dog contract unenforceable in the Federal courts." (Nat. Labor Relations Act of 1935, Hearings before House Com. on Labor on H.R. No. 6288, 74th Cong., 1st Sess., at p. 14 (1935), statement of Sen. Wagner; accord, remarks of Sen. Wagner, Debate on Sen. No. 1958, 74th Cong., 1st Sess., 79 Cong. Rec. 7570 (daily ed. May 15, 1935); see H.R.Rep. No. 1147, 74th Cong., 1st Sess., *supra*, at p. 19.)[4]

---

[3] Congress took to heart, as it had in the Norris-LaGuardia Act, Chief Justice Taft's admonition that because a "single employee was helpless in dealing with an employer," collective action "was essential to give laborers [the] opportunity to deal on equality with their employer." (*Amer. Foundries v. Tri-City Council* (1921) 257 U.S. 184, 209, quoted in H.R.Rep. No. 1147, 74th Cong., 1st Sess., p. 10 (1935) and H.R.Rep. No. 669, 72d Cong., 1st Sess., *supra*, at p. 7.)

[4] Senator Wagner's "intent was the intent of Congress, for unlike most other major legislation, this statute was the product of a single legislator. Although

*(footnote continued on next page)*

5

Recognizing as clear "the legality of collective action on the part of employees in order to safeguard their proper interests," the post-*Lochner* Supreme Court now upheld against constitutional challenge Congress's "safeguard" of this right. (*Labor Board v. Jones & Laughlin* (1937) 301 U.S. 1, 33-34.)

In the years since the Wagner Act's passage, the Supreme Court, Courts of Appeals, and National Labor Relations Board have conclusively established that the right to engage in collective action includes the pursuit of actions in court. (*Eastex, Inc. v. NLRB* (1978) 437 U.S. 556, 565-566 [the Wagner Act's " 'mutual aid or protection' clause protects employees from retaliation by their employers when they seek to improve working conditions through resort to administrative and judicial forums"]; *Brady v. National Football League* (8th Cir. 2011) 644 F.3d 661, 673 ["a lawsuit filed in good faith by a group of employees to achieve more favorable terms or conditions of employment *is* 'concerted activity' under § 7" of the Wagner Act]; *Mohave Electric Cooperative* (1998) 327 NLRB 13, 18, enforced by *Mohave Elec. Co-op., Inc. v. N.L.R.B.* (D.C. Cir. 2000) 206 F.3d 1183, 1188-1189 [same]; *Altex Ready Mixed Concrete Corp.* (1976) 223 NLRB 696, 699-700, enforced by *Altex Ready Mixed Concrete Corp. v. N.L.R.B.* (5th Cir.) 542 F.2d 295, 297 [same]; *Leviton Manufacturing Company, Inc. v. N.L.R.B.* (1st Cir. 1973) 486 F.2d 686, 689 [same].) This right extends to the filing of wage and hour class actions (*United Parcel Service, Inc.* (1980) 252 NLRB 1015, 1018, enforced by *N.L.R.B. v. United Parcel Service, Inc.* (6th Cir. 1982) 677 F.2d 421),

_____

*(footnote continued from previous page)*

Wagner received assistance from various sources, he fully controlled the bill's contents from introduction to final passage." (Morris, *Collective Rights as Human Rights: Fulfilling Senator Wagner's Promise of Democracy in the Workplace— The Blue Eagle Can Fly Again* (2005) 39 U.S.F. L.Rev. 701, 709.)

including wage class actions filed by former employees like Iskanian (see *Harco Trucking, LLC* (2005) 344 NLRB 478, 482). The Wagner Act thus prohibits, as an unfair labor practice, employer interference with the ability of current or former employees to join collectively in litigation.

## II.

Today's class waivers are the descendants of last century's yellow dog contracts. (See *D.R. Horton & Cuda* (Jan. 3, 2012) 357 NLRB No. 184, p. 6.) CLS Transportation's adhesive form contract includes a clause prohibiting Iskanian, like all its employees, from pursuing class or representative suits or class arbitrations.[5] Thus, Iskanian may not file collectively with fellow employees a suit or an arbitration claim challenging any of CLS's employment practices or policies. Patently, the effect of the clause is to prevent employees from making common cause to enforce rights to better wages and working conditions. In this, the clause is indistinguishable from the yellow dog contracts prohibited by the Norris-LaGuardia and Wagner Acts. Indeed, the whole point of protecting a right to collective action is to allow employees to do precisely what CLS Transportation's clause forbids—band together as a group to peaceably assert rights against their employer.

---

[5] The clause provides: "[E]xcept as otherwise required under applicable law, (1) EMPLOYEE and COMPANY expressly intend and agree that class action and representative action procedures shall not be asserted, nor will they apply, in any arbitration pursuant to this Policy/Agreement; (2) EMPLOYEE and COMPANY agree that each will not assert class action or representative action claims against the other in arbitration or otherwise; and (3) each of EMPLOYEE and COMPANY shall only submit their own, individual claims in arbitration and will not seek to represent the interests of any other person." ("Proprietary Information and Arbitration Policy/Agreement," ¶ 16(b) (Iskanian's contract).)

7

That the class waiver is without effect necessarily follows. An employer may not by contract require an employee to renounce rights guaranteed by the Wagner Act (*Nat. Licorice Co. v. Labor Board* (1940) 309 U.S. 350, 359-361; see *id.* at p. 364 ["employers cannot set at naught the National Labor Relations Act by inducing their workmen to agree not to demand performance of the duties which it imposes"]), and this includes a contract clause requiring an employee to resolve disputes in individual, binding arbitration. Such a clause "is the very antithesis of collective bargaining [and] . . . impose[s] a restraint upon collective action." (*National Labor Relations Board v. Stone* (7th Cir. 1942) 125 F.2d 752, 756; see *Barrow Utilities & Electric* (1992) 308 NLRB 4, 11, fn. 5 ["The law has long been clear that all variations of the venerable 'yellow dog contract' are invalid . . . ."].) The restriction in Iskanian's contract thus directly contravenes federal statutory labor law and is invalid on its face. A contract clause that violates the Wagner Act is unenforceable. (*Kaiser Steel Corp. v. Mullins* (1982) 455 U.S. 72, 83-86; *J. I. Case Co. v. Labor Board* (1944) 321 U.S. 332, 337 [private contracts that conflict with the Wagner Act "obviously must yield or the Act would be reduced to a futility"].) Iskanian may not be prevented, on the basis of his contract, from proceeding with a putative class action.

## III.

Notwithstanding this authority, CLS Transportation invokes the FAA as grounds for upholding the class waiver.

In the early part of the 20th century, merchants faced judicial hostility to predispute arbitration agreements they entered with their fellow merchants; routinely, the courts declined to enforce such agreements, relying on the common law rule that specific enforcement of agreements to arbitrate was unavailable. (H.R.Rep. No. 96, 68th Cong., 1st Sess., pp. 1-2 (1924); Wasserman, *Legal Process in a Box, or What Class Action Waivers Teach Us About Law-making*

8

(2012) 44 Loy. U. Chi. L.J. 391, 395.)  In 1925, Congress enacted the FAA in response.  Its purpose was to have arbitration agreements "placed upon the same footing as other contracts."  (H.R.Rep. No. 96, at p. 1)

Section 2 of the FAA, its "primary substantive provision" (*Moses H. Cone Hospital v. Mercury Constr. Corp.* (1983) 460 U.S. 1, 24), makes this point explicit:  An arbitration agreement "shall be valid, irrevocable, and enforceable, *save upon such grounds as exist at law or in equity for the revocation of any contract*" (9 U.S.C. § 2, italics added).  Here, we deal with a provision—the waiver of the statutorily protected right to engage in collective action—that would be unenforceable in any contract, whether as part of an arbitration clause or otherwise.  The FAA codifies a nondiscrimination principle; "[a]s the 'saving clause' in § 2 indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so." (*Prima Paint v. Flood & Conklin* (1967) 388 U.S. 395, 404, fn. 12.)  That purpose is not upset by precluding, in arbitration clauses and employment contracts alike, mandatory class waivers forfeiting the right to engage in collective action, a right foreshadowed by section 3 of the Norris-LaGuardia Act and guaranteed by section 7 of the Wagner Act.  Accordingly, there is no conflict between the FAA and the Norris-LaGuardia and Wagner Acts, nor is there anything in the FAA that would permit disregard of the substantive rights guaranteed by those later enactments.

Were one to perceive a conflict, the express text of the Norris-LaGuardia Act would resolve it.  The 1932 act supersedes prior law, including any contrary provisions in the 1925 FAA:  "All acts and parts of acts in conflict with the provisions of this chapter are repealed." (29 U.S.C. § 115.)  The effect of this provision, in combination with section 3 (29 U.S.C. § 103) banning yellow dog contracts and the FAA's section 2 (9 U.S.C. § 2), subjecting arbitration agreements to the same limits as other contracts, is to render equally

9

unenforceable contractual obligations to forswear collective action in regular employment agreements and in employment arbitration agreements.

Brief reflection on the purposes underlying the Norris-LaGuardia Act and Wagner Act demonstrates why this must be so. A strike for better wages and working conditions is core protected activity. (*Labor Board v. Erie Resistor Corp.* (1963) 373 U.S. 221, 233-235; *Automobile Workers v. O'Brien* (1950) 339 U.S. 454, 456-457.) So too is a walkout. (*Labor Bd. v. Washington Aluminum Co.* (1962) 370 U.S. 9, 14-17; *N.L.R.B. v. McEver Engineering, Inc.* (5th Cir. 1986) 784 F.2d 634, 639; *Vic Tanny Intern., Inc. v. N.L.R.B.* (6th Cir. 1980) 622 F.2d 237, 240-241.) But the expressly declared fundamental purpose of the Wagner Act is to minimize industrial strife. (29 U.S.C. § 151 ["[P]rotection by law of the right of employees to organize and bargain" is necessary to "promote[] the flow of commerce by removing certain recognized sources of industrial strife and unrest"]; see *Brooks v. Labor Board* (1954) 348 U.S. 96, 103 ["The underlying purpose of [the Wagner Act] is industrial peace."]; Atleson, Values and Assumptions in American Labor Law (1983) p. 40 ["The most common argument in favor of the Wagner Act was that it would reduce industrial strife."].) The Wagner Act "seeks, to borrow a phrase of the United States Supreme Court, 'to make the appropriate collective action (of employees) an instrument of peace rather than of strife.' " (H.R.Rep. No. 1147, 74th Cong., 1st Sess., *supra*, at p. 9.) If a class waiver provision in an arbitration agreement were deemed enforceable, Iskanian and other employees would be protected if they elected to protest through strikes or walkouts but precluded from resolving grievances through peaceable collective action—a result precisely opposite to the reduction in industrial strife at the heart of the Wagner Act's goals. Congress would not have favored less peaceable means over more peaceable ones.

Alternatively, if the device of inserting a collective action ban in an arbitration clause were enough to insulate the ban from the Norris-LaGuardia and Wagner Acts' proscriptions, employers could include in every adhesive employment contract a requirement that *all* disputes and controversies, not just wage and hour claims, be resolved through arbitration and thus effectively ban the full range of collective activities Congress intended those acts to protect. Such a purported harmonizing of the various acts would gut the labor laws; the right to " 'collective action would be a mockery.' " (H.R.Rep. No. 669, 72d Cong., 1st Sess., *supra*, at p. 7.) When Congress invalidated yellow dog contracts and protected the right to engage in collective action, it could not have believed it was conveying rights enforceable only at the grace of employers, who could at their election erase them by the simple expedient of a compelled waiver inserted in an arbitration agreement.

CLS Transportation argues *AT&T Mobility LLC v. Concepcion* (2011) 563 U.S. 321 [179 L.Ed.2d 742, 131 S.Ct. 1740] and *CompuCredit Corp. v. Greenwood* (2012) 565 U.S. ___ [181 L.Ed.2d. 586, 132 S.Ct. 665] save its class waiver. Neither does.

*Concepcion* considered whether as a matter of obstacle preemption the FAA foreclosed a state-law unconscionability rule applicable to class waivers in consumer contracts. (*AT&T Mobility LLC v. Concepcion*, *supra*, 563 U.S. at p. ___ [131 S.Ct. at p. 1746].) It did not speak to the considerations entailed in reconciling the FAA with other coequal federal statutes. Nor did it address any of the particulars of Congress's subsequent labor legislation codifying employees' substantive rights to engage in collective action, rights not shared by consumers.

*CompuCredit Corp. v. Greenwood*, *supra*, 565 U.S. ___ [132 S.Ct. 665] is similarly of no assistance. There, the Supreme Court reaffirmed that to determine whether the FAA's presumption in favor of enforcing arbitration clauses applies to

11

a given claim, one must ask whether the presumption has been " 'overridden by a contrary congressional command' " in other federal law. (*Id.* at p. ___ [132 S.Ct. at p. 669].) The claims at issue there arose under a federal law that guaranteed consumers notice of a " ' "right to sue." ' " (*Ibid.*, quoting 15 U.S.C. § 1679c(a).) Had Congress intended to preclude arbitration as a suitable forum under the applicable act, "it would have done so in a manner less obtuse" than one offhand reference to a right to sue. (*CompuCredit*, at p. ___ [132 S.Ct. at p. 672].) In contrast, the Norris-LaGuardia Act and Wagner Act present no similar difficulties for discerning a contrary congressional command. Such a command may be evident from "the text of the [other statute], its legislative history, or an 'inherent conflict' between arbitration and the [other statute's] underlying purposes." (*Gilmer v. Interstate/Johnson Lane Corp.* (1991) 500 U.S. 20, 26.) Each such source supplies support here: the conclusion that class waivers are foreclosed arises not from inferences gleaned from a lone phrase, as in *CompuCredit*, but from the explicit text, legislative history and core purpose of the acts, all establishing the right to collective action and the illegality of compelled contractual waivers of that right. (See *ante*, pts. I. & II.)

Refusing to enforce a National Labor Relations Board order finding a class waiver violative of the Wagner Act, a divided Fifth Circuit reached a contrary conclusion. (*D.R. Horton, Inc. v. N.L.R.B.* (5th Cir. 2013) 737 F.3d 344 (*Horton II*), declining to enforce *D.R. Horton & Cuda*, *supra*, 357 NLRB No. 184.) The majority's analysis assumed a congressional command superseding the FAA could come only from "the general thrust of the [Wagner Act]—how it operates, its goal of equalizing bargaining power" (*Horton II*, at p. 360) and the "congressional intent to 'level the playing field' between workers and employers" (*id.* at p. 361), sources the majority found insufficient. One need not look to such generalized and abstract indications. As discussed, the FAA subordinates arbitration

12

agreements to generally applicable bars against contract enforcement (9 U.S.C. § 2), and the Wagner Act by its text bars employers from contractually conditioning employment on waiver of the right to engage in collective action (29 U.S.C. §§ 157, 158(a)(1); see *Nat. Licorice Co. v. Labor Board*, *supra*, 309 U.S. at pp. 359-361).

*Horton II* also took comfort in the fact rule 23 of the Federal Rules of Civil Procedure (28 U.S.C.), governing class actions, was not adopted until 1966. (*Horton II*, *supra*, 737 F.3d at p. 362.) But that the most prevalent current form of collective litigation is recent does not mean the Wagner Act at its inception did not shield from waiver the right to collective litigation in whatever manner available. Collective actions via the common law doctrine of virtual representation, based on equity principles, are of much older vintage than rule 23. (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 988-989 (conc. opn. of Werdegar, J.).) "The 74th Congress knew well enough that labor's cause often is advanced on fronts other than collective bargaining and grievance settlement within the immediate employment context. It recognized this fact by choosing, as the language of § 7 makes clear, to protect concerted activities for the somewhat broader purpose of 'mutual aid or protection' as well as for the narrower purposes of 'self-organization' and 'collective bargaining.' " (*Eastex, Inc. v. NLRB*, *supra*, 437 U.S. at p. 565.) The broad language of the Wagner Act shields concerted activity for mutual aid or protection by whatever means pursued, including through peaceable collective suits.

In the end, CLS Transportation's argument rests on the notion that the FAA should be interpreted to operate as a super-statute, limiting the application of both past and future enactments in every particular. "[M]en may construe things after their fashion/Clean from the purpose of the things themselves." (Shakespeare, Julius Caesar, act I, scene 3, lines 34-35.) So it is with this view of the FAA. The

13

text and legislative history of the Norris-LaGuardia and Wagner Acts, passed by legislators far closer in time to the FAA than our current vantage point, show no such deference. The right of collective action they codify need not yield.

I respectfully dissent.

**WERDEGAR, J.**

*See last page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Iskanian v. CLS Transportation Los Angeles, LLC
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 206 Cal.App.4th 949
**Rehearing Granted**

_____

**Opinion No.** S204032
**Date Filed:** June 23, 2014
_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Robert L. Hess

_____

**Counsel:**

Initiative Legal Group, Raul Perez, Katherine W. Kehr; Capstone Law, Glenn A. Danas, Ryan H. Wu; Pubic Citizen Litigation Group and Scott L. Nelson for Plaintiff and Appellant.

Julie L. Montgomery and Cynthia L. Rice for California Rural Legal Assistance Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Altshuler Berzon, Michael Rubin; McGuinn, Hillsman & Palefsky and Cliff Palefsky for Service Employees International Union and California Employment Lawyers Association as Amici Curiae on behalf of Plaintiff and Appellant.

Rosen Law Firm and Glenn Rosen for California Association of Public Insurance Adjusters as Amicus Curiae on behalf of Plaintiff and Appellant.

Amy Bach; The Bernheim Law Firm, Steven Jay Bernheim and Nazo S. Semerjian for United Policyholders as Amicus Curiae on behalf of Plaintiff and Appellant.

Sanford Heisler, Janette Wipper, Felicia Medina, Chioma Chukwu; Barbara A. Jones; Melvin Radowitz; Della Barnet; and Jennifer Reisch for Timothy Sandquist, AARP, Equal Rights Advocates and The Impact Fund as Amici Curiae on behalf of Plaintiff and Appellant.

Arbogast Bowen, David M. Arbogast and Chumahan B. Bowen for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Fox Rothschild, David F. Faustman, Yesenia M. Gallegos, Cristina Armstrong, Namal Tantula; Cole, Schotz, Meisel, Forman & Leonard and Leo V. Leyva for Defendant and Respondent.

Jones Day, George S. Howard, Jr., and Mhairi L. Whitton for Retail Litigation Center, Inc., and California Retailers Association as Amici Curiae on behalf of Defendant and Respondent.

**Counsel:**

Deborah J. La Fetra for Pacific Legal Foundation as Amicus Curiae on behalf of Defendant and Respondent.

Sheppard, Mullin, Richter & Hampton, Richard J. Simmons, Karin Dougan Vogel and Matthew M. Sonne for Employers Group as Amicus Curiae on behalf of Defendant and Respondent.

Amar D. Sarwal, Evan P. Schultz and Allen C. Peters for Association of Corporate Counsel as Amicus Curiae on behalf of Defendant and Respondent.

Littler Mendelson, Henry D. Lederman, Alexa L. Woerner, Robert Friedman and Edward Berbarie for The National Retail Federation and Rent-A-Center, Inc., as Amici Curiae on behalf of Defendant and Respondent.

Erika C. Frank; and Fred J. Hiestand for The California Chamber of Commerce and The Civil Justice Association of California as Amici Curiae on behalf of Defendant and Respondent.

Horvitz & Levy, Lisa Perrochet, John F. Querio and Felix Shafir for California New Car Dealers Association as Amicus Curiae on behalf of Defendant and Respondent.

Mayer Brown, Andrew J. Pincus, Archis A. Parasharami, Scott M. Noveck and Donald M. Falk for The Chamber of Commerce of the United State of America as Amicus Curiae on behalf of Defendant and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**


Glenn A. Danas
Capstone Law
1840 Century Park East, Suite 450
Los Angeles, CA  90067
(310) 556-4811

Michael Rubin
Altshuler Berzon
177 Post Street, Suite 300
San Francisco, CA  94108
(415) 421-7151

David F. Faustman
Fox Rothschild
1800 Century Park East, Suite 300
Los Angeles, CA  90067
(310) 598-4150

Andrew J. Pincus
Mayer Brown
1999 K Street, N.W.
Washington, DC  20006
(202) 263-3000